Downet, Judge,
delivered the opinion of the court:
This action is upon a contract entered into on the 8th day of July, 1907, between the plaintiff and the United States for the construction of a system of electric lighting on the Government reservation at Columbus Barracks, Ohio. The work was completed and the contractor was paid the contract price in full without deduction. The action is for the recovery of certain amounts alleged to be due principally on account of changes made in portions of the system, entailing upon the contractor, as it is alleged, additional expense for labor and material.
The specifications include both an outside system of lighting, designed also to be connected with the interior system in the various buildings, and also inside systems for the buildings themselves. The specifications as to the outside system were *451 in the alternative, contemplating either an underground or an overhead system. The contract with the plaintiff was for the underground system, and at about the same time a contract was entered into with another concern for the installation of the interior systems in the various buildings.
Plaintiff’s first contention is for the recovery of $1,534.68, alleged to be the cost of extra labor and material necessary in the installation of conduits and electric wiring from the points where the service wires entered the various buildings to the main-line switches- where located by the other contractor. The theory of the plaintiff is that the main-line switches should have been located immediately at the points where the service wires entered the various buildings, and that having been located at various points more or less remote therefrom, and having been required by the officer in charge to carry the service wires through proper conduits to the main-line switches as located, it is entitled to extra compensation for the expense incurred in carrying the lines from the points where the switches should have been located to the points where they actually were located. The contention of the plaintiff, as far as its theory is concerned, seems to be correct. The specifications required the plaintiff contractor to carry the service lines to the main-line switch in each building, but they also provided that in case the underground system of distribution was used the main-line switches would be placed in the basements of the buildings and as close to the service entrance as possible. It appears, however, that the controversy as between the contractor and the officer in charge with reference to this plaintiff’s obligations under the contract arose at a time when the outside conduits and service lines had been brought to the various buildings and before they had been brought inside thereof.
There is an attempt made to prove the expense incurred by the contractor for labor and material necessary to carry the service lines to the points in the buildings where the mainline switches were actually located, but a careful examination of the testimony with reference to the submitted detailed statement of expense shows that it is a statement of the expense necessarily incurred in carrying the lines from the point immediately outside of buildings, where they were *452 when the controversy arose, to the main-line switches as located. It is plainly apparent that it was incumbent upon this contractor to carry the service lines inside the buildings and to the main-line switches located as near to the points of entrance as practicable. How much of the expense shown to have been incurred by the contractor in carrying the lines from the outside point to the switches as located was incurred in carrying the lines from the outside point to the points near the entrance where the switches should have been located is not shown. The evidence does not show, except by one general statement of minimum and maximum distance, how far the switches in the various buildings were located away from the point of entrance of the lines, and it does not show what expense was incurred by the contractor in carrying the lines from the points where the switches should have been located to the points where they were located, nor does it show the reasonable value of such service. Plaintiff has evidently left the court in a position where it must estimate for itself, or guess, if it is to determine the amount of the expense shown which it is entitled to recover for that part of the work for which the plaintiff might be held to be entitled to compensation, and this we can not do. It was incumbent upon the plaintiff to show by satisfactory evidence the amount it was entitled to recover on this account, and not having done so there can upon this item be no finding in its favor.
The plaintiff next seeks recovery, as alleged in its petition, of $4,947, but, as shown in the evidence, of a lesser sum, for the furnishing of extra labor and material in connection with the draining of the conduit system. The theory is that the officer in charge departed from the specifications and made changes in the method of draining the conduit system which entailed upon the contractor this additional expense.
For the purposes of this question we quote the general provisions of the specifications under subhead “Drains” as follows:
“Drains.—All transformer manholes and all low points of conduit system shall be connected to the surface drain (not sewer) where directed by the officer in charge.
*453 “All the conduit system shall be given a sufficient slope toward the west and south from numbers 26, 14, and 8 to the lowest points in the rear of numbers 59, 52, and 46 where the manholes shall be connected to the surface drains where directed, or carried to an outlet above ground so as to drain all manholes and conduits. Outlets above ground should be protected by iron grating set in brick heading.”
It seems to be the theory of the plaintiff that the first paragraph quoted prescribed the contemplated drainage system, and that thereunder it was not only the duty but the right of the contractor to drain each manhole by an individual drain to the nearest point in the surface drain. This surface drain was not in fact a drain upon the surface of the ground, but it was an underground drainage system called a surface drain, because it collected and carried off surface waters and waters from the roofs of the various buildings. The plans for the underground electric system, which were submitted to bidders, and which became a part of the contract entered into by the plaintiff, contained nothing with reference to the location or the depth of this surface-drainage system, and it does not appear that any representations of any kind were made to the contractor with reference thereto. It does appear that the surface drain, at points near to manholes in the conduit system, was in almost all cases at a higher elevation than the bottoms of the manholes. The specifications clearly contemplated that the conduits, which were to carry the wires in the underground system, should leave the manholes 8 inches above the bottom thereof, and that the drain should leave from the bottom of the manholes. It is plainly apparent that a drain leaving the manhole otherwise than from the bottom could not perform its proper office, and it is equally apparent that the purpose of the drainage system contemplated in connection with the underground conduit system was to properly drain the conduit system in all its parts. The purpose of the drainage system, necessarily known to the contractor, is sufficient to notify him that it was required to be installed in such a manner as properly to perform its functions, and to assume that the functions of the drainage system could be properly performed by installing a drain from the bottom of a manhole to a point *454 in the surface drain which was at a higher elevation presents an absurdity. Such installation, it is plainly apparent, would not only not drain the conduit system, but it would very effectually serve to flood the conduit system from the surface drain.
It is shown and found that the reservation at Columbus Barracks was not on a level, but that there was a slope from north to south and also a slope from east to west. It is reasonably to be presumed from an application of matters of common knowledge that an individual drain from each manhole might have been carried at a descending grade into a surface drain or to an outlet above the ground if carried a sufficient distance with the slope,* and since the paragraph of the specifications provided that the connection with the surface drain should be made where directed by the officer in charge, it may be concluded that even if the plaintiff’s theory of individual drainage from the different manholes is correct it could have been required to carry these individual drains such a distance as might be necessary to furnish an outlet at a lower elevation.
But the first paragraph of the specifications quoted is not all that is for consideration in connection with the drainage system. That paragraph did provide that all transformer manholes and low points of the conduit system should be connected to the surface drain where directed by the officer in charge, but it also provided that the entire conduit system should be given a slope toward the west and south from certain buildings named, which are shown to be along the east side of the reservation, to the lowest points in the rear of certain other buildings, which are shown to be near the west side of the reservation, where the manholes would be connected to the surface drains where directed or carried to an outlet above ground so as to drain all manholes and conduits.
As against the plaintiff’s theory of individual drainage from each manhole in connection with the conclusion that, if tenable at all, it must contemplate an individual drainage so installed as to be effective for the purpose, let us consider briefly what was required of the contractor in the installa *455 tion of the system. Trenches were necessarily opened by the contractor from manhole to manhole in which to lay the required conduit. Under the individual theory of drainage, a separate trench must necessarily have been opened from each manhole for drainage purposes, and that trench must necessarily have been opened a sufficient depth to receive a drain having its outlet in the bottom of the manhole. Instead of opening this individual trench from each manhole for the purpose of individual drainage, the contractor was required to excavate an additional depth of from one and a half to two feet in the bottom of the trench already opened for conduit purposes and to lay therein a • drain running underneath the conduit from manhole to manhole in succession until carried to a proper point of outlet. It seems quite plainly apparent that this system of installation must have required less of excavation and probably less of drain tile than would have been required to carry an individual drain from each manhole a sufficient distance with the slope to find an outlet in the surface drain at a lower elevation. In addition to this, it appears and is found that over a part of the system the contractor was relieved from the installation of any separate drain at all by being permitted by the officer in charge to set the conduits flush with the bottom of the manholes so that the conduits themselves served to carry the drainage. It would seem, therefore, that the method of installation adopted by the officer in charge and required of the contractor entailed upon the contractor less of labor and expense than would have been required to install an individual system upon such a basis as to accomplish its intended purpose.
Aside from this view of the situation it is also to be remembered that it was given to the officer in charge by the contract to determine the true intent and meaning of the specifications. He determined that the specifications contemplated a drainage of the entire system with the general slope of the reservation to three designated general points of outlet, and he required the installation of the system in accordance with this interpretation. If the specifications were ambiguous and difficult of interpretation in this respect, *456 we think it quite apparent that it was, by the contract, given to the officer in charge to solve the ambiguity by his interpretation, and in the absence of any showing of an abuse of the discretion vested in him we think his interpretation must be regarded as conclusive.
In the case of Merrill-Ruckgaber Company v. United States, 241 U. S., 387, a contract giving to the Supervising Architect practically the same power of interpretation as is given to the officer in charge in the contract involved in the instant case, was under consideration, and the Supreme Court, reviewing the contention of the parties, clearly recognized the conclusive character of an interpretation by the Supervising Architect.
But aside from that theory and not predicating our conclusion solely upon the right of the officer in charge to interpret, we are further of the opinion that the interpretation put upon the specifications by the officer in charge was a correct interpretation. Some point is attempted to be made by reason of the fact that the specifications directing drainage in the surface drain said parenthetically “ not sewer,” and that as a matter of fact one point of outlet provided in the southwest corner of the reservation was into a manhole constructed by the United States over a sewer called a combination surface drain and sewer manhole. It would seem quite clear that if the officer in charge had directed connection into a sewer rather than into a surface drain without thereby entailing additional expense upon the contractor, the contractor would have no ground of complaint on account thereof.
The provision against drainage into the sewer may reasonably be concluded to have been a provision for the protection of the United States against the possible ill effects arising from the connection of the manholes in the electric system with a sewer; and if the conditions at any one point were such that connections with a sewer were found to be not detrimental from the standpoint of the United States, we are not able to see upon what ground the contractor could find any objection thereto. But, as a matter of fact, it clearly appears that if the outlet in the southwestern corner had not been provided in the combination surface drain and *457 sewer manhole, the contractor would have been required to carry his drainage a much greater distance in order to reach an outlet above ground as contemplated by the specifications; and since it clearly appears that the combination surface drain and sewer manhole was constructed by the United States at its own expense for the purpose of furnishing a more accessible outlet, it seems quite clear that no ground of complaint on account thereof is furnished the contractor. Some point is also sought to be made on the alleged fact that the contractor was required to carry drainage from the northwestern corner of the reservation a considerable distance outside of the reservation and to a city sewer. We have not found in accordance with the contractor’s contention in that respect. It appears, as a matter of fact, that the point in the northwestern corner from which this drainage was taken was a low point, and that the contractor was required to carry the drainage to such distance as was necessary to find an outlet above ground, as contemplated by the specifications.
Upon the whole, we are not able to conclude that the plaintiff has established any basis of recovery upon this item. Its proof as to the additional expense put upon it is upon the theory that it was entitled to drain each manhole into the surface drain at the nearest point, and with that theory we can not agree. It has not shown any basis of recovery upon any other theory.
The third claim is for $2,673.39, alleged to be the cost of labor and material furnished over and above that called for by the contract on account of changes made in locating trenches and manholes and in the location of some of the buildings. Findings are reasonably full upon the question. It was within the right of the officer in charge under the contract to make such slight changes in the location of manholes and conduits as might -be necessary either to clear obstructions or to secure a better site. Slight changes were made at different points in the system, but it appears from the findings that, eliminating a situation in the southwest corner of the reservation, the aggregate of all the changes made resulted in the use of less linear feet of conduit than *458 was required by the original plans. It also appears that some of the changes which were made in the location of manholes and consequently in the location of the conduits between the manholes were to the material advantage of the contractor. The contractor was required under the specifications to replace the disturbed surface over the trenches as it originally existed. It appears that in some instances the trenches, as the system was originally laid out, must have passed through concrete and brick walks under such circumstances as to have entailed a considerable expense upon the contractor in restoration thereafter. Where changes in location were made for the purpose of avoiding such conditions they were plainly to the advantage of the contractor. Indeed, it appears that, in some instances, in connection with access to buildings, changes of that character were made at the request of the contractor in order to avoid the necessity of taking up and replacing walks. Hence it clearly appears that, eliminating the southwestern corner of the system from consideration, the advantages were with the contractor both in the amount of conduit required and in the avoidance of unduly expensive conditions.
The changes made in the southwestern corner are separately considered because of the conditions requiring them. Added to the changes made in the rest of the system, the changes in this corner, which are shown to have involved an increase of 825 linear feet of conduit, made a total increase in the linear feet of conduit in the whole system of 144 feet. The linear feet of conduit referred to in the southwestern corner was the linear feet of a three-way conduit, which therefore meant in linear feet of excavated trench one-third of that number. This is shown to have been made necessary in order to provide a different site for a manhole in that comer of the reservation, and the different site for the manhole was made necessary in turn in order that it might be so located as to drain to the contemplated outlet; and in this connection is for consideration the fact that the outlet, while a changed outlet from that contemplated, was a more accessible outlet entailing less expense upon the contractor. Adherence to the original plans would *459 have required the contractor in this comer of the reservation to have carried the drainage a considerable distance to an available outlet above ground. In lieu thereof the United States at its own expense constructed the manhole, called a combination surface drain and sewer manhole, into which the drainage was carried. Without further discussion in detail, it seems to us that the changes made in the system were in the aggregate to the advantage of the contractor. At least, it must be said that the contractor has not satisfactorily shown that the aggregate of the changes made entailed additional expense upon it, and without such showing it has not furnished a proper basis for a recovery.
The plaintiff next seeks to recover $720 as the alleged additional expense of procuring sod and resodding the trenches. Wherever sod was removed in the excavation of the trenches, it was the duty of the contractor, upon completion of the work, to restore it. It alleges an agreement with the officer in charge whereby, in consideration of the officer being permitted to take the sod removed from the trenches for other purposes, it was to be permitted to seed the tops of the trenches when completed instead of resodding. It is found that as to a certain section of the work between designated manholes such an agreement was made, and that as to that section the contractor was not required to resod. As to the rest of the system, it appears that the sod laid, when removed, along the side of the trenches, was permitted to lay there for months, during both hot and cold weather. It is properly to be regarded as a matter of common knowledge that sod permitted so to lay in the heat of the warm months and through the freezes of the cold months would become worthless for resodding purposes, and, in all probability, would practically disintegrate. However that may be, it is not found that, except as to the section referred to, the contractor was in any way relieved from his liability to resod the trenches, and it follows that no basis is shown for a recovery upon this item.
As its last contention the plaintiff seeks to maintain its right to compensation to the extent of three-fourths of its bid price for certain contemplated extra work. We have not *460 been able to conclude from the record that the contractor in fact performed three-fourths of this contemplated work. It does appear that part of this work was the installation of an additional manhole and the carrying of conduit and service lines thereto for the purpose of furnishing light to buildings which, it was anticipated, might be erected in that locality at some time in the future, and that the contractor did install about 150 feet of conduit necessary for this purpose, but it also appears that this 150 feet of conduit was installed by the contractor in a trench already open, in which it was required under its existing contract to install other conduit, and that as this line of trench constituted part of the line necessary to reach the contemplated additional manhole, this 150 feet of conduit was installed by the contractor, of its own motion, in this trench thus open in order that it might have the benefit of it without reexcavating when it came to the performance of the whole work for which it had submitted its bid at $800. It appears that its bid was never accepted; that there never was any contract entered into for this additional work; and that, in fact, the 150 feet of conduit thus installed have never been used by the United States, and, so far as appears, are of no value to the United States.
In connection with the discussion of the other items of the claim preceding this last one, we have taken no account of the provision in the contract to the effect that no charge for extra work would be allowed unless the same had been ordered in writing by the officer in charge, the price stated in the order and accepted by the contractor. Consideration of the effect of that provision was not necessary to a conclusion in the other items, and it is entirely possible that the claims of the contractor under the first three items, if otherwise sustained, would not be regarded as claims for extra work under this provision of the contract, but rather as claims for additional work within its contract, made necessary by changes in the plans. But aside from the conclusion as to the last item that the contractor did not do this extra work as claimed, except as to the 150 feet of conduit, the conclusion would probably be forced, if the contractor’s contention as to this work were otherwise sustained, that it was clearly extra work within this provision of the contract, and, under well- *461 settled authorities, could not be recovered for except it be authorized as provided for in the contract. Upon either or both views of the matter the conclusion as to this item must be against the plaintiff.
Upon the whole case the court concludes that the plaintiff has not established any basis of recovery, and that therefore its petition should be dismissed, and it is so ordered.
Campbell, Chief Justice, Booth, Judge, and Barney, Judge, concur.