(117 So. 729)

No. 26741.

**FRITZ JAHNCKE, Inc., v. FIDELITY & DE-POSIT CO. OF MARYLAND et al.**

May 23, 1927. On the Merits, March 12, 1928.
On Rehearing June 4, 1928.

Denegre, Leovy & Chaffe, of New Orleans, for appellant.

Eldon S. Lazarus, of New Orleans (Herbert S. Weil, of New Orleans, of counsel), for appellee Benev. Ass'n of Elks.

P. M. Milner, of New Orleans (Nat W. Bond and Milner & Porteous, all of New Orleans, of counsel), for appellee H. W. Bond & Bro.

Lemle, Moreno & Lemle, of New Orleans, for intervener Salmem Brick & Lumber Co.

On Motion to Dismiss.

ST. PAUL, J. This is a motion by H. W. Bond & Bro. to dismiss the appeal herein taken by John Thatcher & Son, the sole appellants, on the ground that said appellants have *no interest* in prosecuting said appeal.

This appeal was taken from a judgment amending, and approving as amended, the report of a special commissioner appointed to hear and make recommendations in these concursus proceedings. The proceedings arose over the distribution of a fund deposited in the registry of the court, which fund grew out of a building contract between the Benevolent Association of Elks, as owner, and John Thatcher & Son, as contractors.

The parties to the concursus are (or were) the aforesaid owner and contractors, the surety on the contractors' bond (the defendant named in the caption), and a host of subcontractors and furnishers of material, including the plaintiff above named and the mover herein.

### I.

The alleged want of interest on the part of appellants is (1) that, prior to the inauguration of this concursus proceeding, they had assigned to the Lawyers' Title & Trust Company of New York $22,000 out of the last payment due them on the building, which last payment constituted the fund deposited in court, and of which only some $10,000 remains undistributed; and (2) that the interest of said John Thatcher & Son "in the fund in court" has been seized under certain garnishment processes issued against them.

### II.

It does not appear from the record what was the nature of the assignment above mentioned. Appellants admit (Tr. 182) that there was such an assignment, and also that they are "[still?] indebted unto the Lawyers' Title & Trust Company of New York in the sum of $22,000," from which it rather appears that said assignment was made only as *security* for a debt of like amount. But, at any rate, in the assignment of any credit, the assignor warrants *at least* that the credit is fully due him. Thus, "even where the words *without recourse* are added in an assignment

of a chose in action, there still remains an implied warranty that the right transferred is what it purports to be; namely, that it is a valid and genuine obligation of the parties. * * * " 2 R. C. L. 627. Cf. 5 C. J. 966, and R. C. C. § 2646.

■ So that appellants, as warrantors, have a manifest interest in protecting the fund as far as possible for their assignee. Under such circumstances they would have a right of appeal herein even had they not originally been parties to the suit. C. P. 571.

### III.

■ Movers have evidently confused the seizure of a party's interest in a pending suit, with the seizure under garnishment of a fund then in the hands of some third person and afterwards deposited by him in court for distribution, as was the case here.

Where a party's interest in a pending suit, i. e., his *whole* interest therein, has been seized, this deprives him of subsequent full control over the trial thereof, *if the seizing creditor insist upon it;* but nevertheless even such seizure does not divest him of his whole interest in that suit until an actual sale thereof takes place. See Garlick v. Williams Med. & Surg. Inst., 132 La. 670, 61 So. 732, and particularly the concluding words of the *decree.*

But when, as here, a number of persons have seized a fund in the hands of some third person, and such third person deposits said fund in court for distribution, it would be absurd to say that the person to whom said fund primarily belongs has no interest in protecting the same, even though the sum total of claims presented may exceed the whole amount of such fund; for that would be the same as to say that a claim presented against a fund deposited in court cannot be contested by the owner of that fund.

### Decree.

The motion to dismiss is therefore denied.

### On the Merits.

THOMPSON, J. The Benevolent Association of Elks entered into a contract with John Thatcher & Son on March 13, 1917, for the construction of what is known as the Elks' Home in this city. The contract price as finally agreed on, after making certain deductions and allowances for extras, was $290,312.65.

There was paid the contractor on account, from time to time as the work progressed, the sum of $222,628, leaving a balance due on the contract, when the building was completed and accepted, of $67,684.65.

Before the building was completed and accepted, the contractor defaulted in his payments for labor and material and with his subcontractors, and numerous liens were recorded against the owner. Numerous garnishments were also served on the owner.

The plaintiff herein, a furnisher of material, instituted this proceeding, by which the owner, the contractor, the surety on the contractor's bond, the subcontractors, and some 38 materialmen and laborers who had recorded their claims were cited in order that their respective rights might be determined and adjusted.

The Elks Association deposited the balance due the contractor in the registry of the court, and prayed to be released from any further liability under its contract with Thatcher & Son.

It also prayed that all liens recorded against its property be canceled.

Answers or interventions were also filed on behalf of the contractor, subcontractors, and the various laborers and furnishers of material who had recorded their claims.

The case was referred to a special commissioner to take the testimony and to report the result of his findings to the court.

As the taking of testimony before the commissioner progressed, many of the claims were admitted by the contractor, and were

paid, under order of court, out of the fund on deposit.

Having completed the taking of testimony on the disputed claims, the commissioner made his final report and conclusions to the court, which in due course was approved, except as to certain matters which were opposed by the contractor and by Bond & Bro., subcontractors.

On a hearing of these oppositions, the court rejected all of the contentions of the contractor and approved the final report of the commissioner, except as to two items, amounting to $1,196.80, claimed by Bond & Bro. against the contractor, which two items were disallowed by the commissioner.

From this judgment, Thatcher & Son only have appealed.

The real contest on this appeal is between the contractor and subcontractor, and between the contractor and the Elks Association.

One of the claims against the Elks is that of interest at the rate of 5 per cent. per annum from August 31, 1919, to September 11, 1920. This claim is made on the theory that the building was completed and accepted at the earlier date mentioned and that the balance of the price was then due, and hence the Elks Association owes interest up to the time of the deposit.

The contract provided that the final payment of 15 per cent. should be made 30 days after the entire work shall have been completed and accepted by the owner. It was stipulated, however, that the contractor should furnish the owner with a certificate, signed and sealed by the recorder of mortgages, to the effect that the owner has filed and registered, in the office of the recorder of mortgages, a notice of its acceptance of the said work and the terms of the contract, and that 45 days shall have elapsed since the recordation of said notice of acceptance. And, further, that no liens or privileges have been filed for record with the recorder of mortgages against the said property or against the contractor, growing out of, or on account of, the execution of the contract; and that the contractor has had canceled and erased all inscriptions created by, or resulting from, the recordation of the contract.

The certificate thus required of the contractor before he could claim the last payment was never furnished the owner. Indeed, it could not be procured from the recorder of mortgages, for the reason that, before the building was completed, there were claims recorded against the property, and garnishments served on the owner for an amount largely in excess of the balance due on the contract. This balance was not due, and payment could not have been demanded by the contractor, prior to the time said balance was deposited in the court. It is clear, therefore, that, under the plain provisions of the contract, the owner was not compelled to pay said balance, could not have done so, except at its risk, and therefore owes no interest.

Another complaint made by the contractor is that the commissioner and the court erred in allowing interest to some 28 claimants from certain dates specified in the commissioner's report, whereas interest should only have been allowed from judicial demand, because of the fact that the proof fails to show the due dates of said accounts. The record declares, however, that four of the parties named were allowed interest only from judicial demand, as that was the prayer of the petition. As to all of the other parties, the respective petitions alleged the maturity of the claims, and prayed for interest from the respective dates fixed by the commissioner.

These petitions were sworn to, and, in the absence of any showing that the claims were not due at the time alleged, we must assume that the commissioner acted on sufficient evidence.

A further complaint is that the commissioner and the court erred in allowing interest to John T. Pender, Albert Weiblen Marble Works, and H. W. Bond & Bro. from the dates set forth, for the reason that the contract with these parties contained a provision that final payment should be made only 30 days after the architects shall have certified to the Elks that said contract was completed, and that said certificate was not given until August 1, 1919.

In the petition of Albert Weiblen Marble Works, it is alleged that petitioner completed the work called for by its contract on July 31, 1919, and prayed for interest from that date. In answer to that petition, Thatcher & Son admitted that fact, but denied that any interest was due until 30 days after the completion of the building.

We have been unable to find in the record any contract containing such a stipulation.

John T. Pender, in his petition, claimed $2,-268.75, with interest from April 5, 1919, $632.-72, with interest from October 31, 1918; and $98.10, with interest from April 11, 1919.

Thatcher & Son did not deny this, nor do we find any contract which postponed the maturity of the claim until thirty days after the completion of the building.

The report of the commissioner and the judgment of the court only allowed Bond & Bro. interest from judicial demand, which was February 12, 1920. See Commissioner's Supplemental Report, vol. 1, p. 215, and judgment of court, vol. 1, p. 246.

The complaint as to interest is therefore not well founded.

It appears that one John Swiler had contracted with Thatcher & Son to do the masonry and brick work, for which he was to receive the sum of $29,457. The contract was entered into some time in March, 1917. Swiler proceeded with his work up to some time in December of that year, when he threw up his contract. He alleged in his pe-

tition in this proceeding that Thatcher & Son defaulted in the payments, and failed to furnish the necessary material. He claimed $1,-632.99 as the balance due him when he quit the work, and $4,000 as profits he would have made had he been permitted to complete his contract.

Thatcher & Son, on the other hand, alleged that Swiler violated his contract without just cause, and notified the contractor that he would not complete the work.

Wherefore Thatcher & Son had to complete the masonry and brick work at an allocated cost of $44,125, and that Swiler owed them this amount, together with 10 per cent. supervision cost, and 10 per cent. as a reasonable profit, less $2,090.51 paid Swiler for the work he had done.

Thatcher & Son therefore claimed from Swiler, for completing the contract, $26,120.-88 in excess of the price that Swiler had agreed to do the work for.

The commissioner found that Swiler had abandoned the work, and had been paid in full for what work he had performed. He also found that Thatcher & Son were not in fault, but concluded that there was no evidence in the record to support the claim for damages against Swiler.

Counsel for Thatcher & Son rely on the testimony of Wogan, the architect, and of Mossie, the representative of the contractor.

We have examined this testimony very carefully, and are constrained to agree with the conclusion of the commissioner, which comes here with the sanction of the trial judge.

Wogan, the architect, did not know anything about what had been paid Swiler for the work performed by him, and did not know what work was performed by Thatcher & Son after taking over the contract.

The most to be obtained from his testimony is that he was furnished a schedule by the contractor after the whole brick work and

tile partitions had been completed, and he approved the same, allowing $27,500 for brick and $5,500 for hollow tile, or a total of $33,000.

This amount, as we understand, was an estimate, intended to cover the whole work of the Swiler contract, from the beginning of the work until its completion by the original contractor.

What proportion of that work was done by Swiler, and what proportion was performed by Thatcher & Son, Wogan did not undertake to say. Nor would he say what amount had been paid Swiler, and what amount had been retained by the contractor.

Nor are we impressed with the claimed probative weight of the testimony of Mossie. He was a salaried employee of Thatcher & Son, and claims to have had the supervision of the work left undone by Swiler. There was prepared, under his direction, a statement showing that something over $16,000 had been paid to laborers.

There are also some 300 separate invoices, aggregating something over $27,000, which, it is claimed, represent material purchased for the completion of the Swiler contract.

There is nothing on the face of these invoices and nothing in the pay rolls to indicate that the labor was performed, or that the material used on the Swiler contract.

The only proof in support of these statements is that of Mossie, who claims that he purchased all of this material, and personally paid all of the laborers.

The commissioner and the trial judge, who had this witness before them, evidently were not impressed with his evidence, otherwise they would have given a judgment for some amount against Swiler. We are persuaded that they judged him rightfully.

The more serious controversy is that between the contractor and the subcontractor Bond & Bro.

The contract of Bond & Bro. required them to do all of the furring, lathing, plastering (both plain and ornamental), cementing, cast cement work, and Caen stonework. There is no dispute, and it seems to be conceded that whatever work of that kind and character was required to be done by Thatcher & Son, under their contract with the Elks, the subcontractor was obliged to do; and that the said subcontractor was bound by the stipulations of the original contract with regard to the supervision and decision of the architect.

The original subcontract price for the plastering, etc., was $18,785, but this amount was augmented during the course of the execution of the contract on account of extra work. All of the claims for this extra work were admitted by the contractor, either in their answer or on the hearing before the commissioner, except the four items which form the subject of controversy on this appeal.

Before considering the four items referred to, it may be well to dispose of a claim made by the contractor against Bond & Bro. for $3,740.81.

After the work of cementing or plastering the parapet walls and penthouse by the subcontractor, the architect condemned it, and ordered it taken off, and replastered.

The subcontractor declined, and the contractor was forced to do the work. The amount above stated is claimed to have been expended for the work.

A large part of the testimony was taken on this issue, and, of course, is quite conflicting.

Under our appreciation of the evidence, we are of the opinion that the architects were justified in condemning the work, and that their action was not arbitrary.

We agree with the commissioner and the trial judge that the defective work was not due primarily to the fault of the subcontractor.

In this connection the commissioner says:

"Regarding the complaint against the thickness of the cement on the penthouse, it is to

be observed that the tile walls of the penthouse were put up by another contractor, whose work did not conform to the requirements of the specifications that the walls should be smooth and plumb. If the coat of cement the interveners applied was too thin in spots, it does not appear but that the fault was of the tile contractor and of his walls rather than that of interveners."

"As to the parapet wall, the photographs filed in evidence convince me that the cracks which developed were due to bad masonry put up by another subcontractor and not to bad cement work."

This claim was therefore properly rejected, both as against Bond & Bro. and the Elks Association.

*Furnishing and Erecting Hangers.*—A hanger is said to be an iron rod approximately the size of a pencil—about from one-fourth to three-eighths of an inch in diameter, and from two to six feet long. The hangers are put through the concrete floor, tied to reenforcement rods, and carry runners that the wire lathing is tied to, so that the plaster is put on, making a suspended ceiling.

It is conceded that the putting in of these hangers was required of the contractor in his contract with the Elks; but the subcontractor claims that the work was not embraced in their contract, and ask $457 for the work as extra.

The argument advanced by the subcontractor is that it was the custom for the contractor to put the hangers in, and that it was easier for him to put the rods through the concrete floors when the concrete was poured. The argument might suffice if the putting in of the rods was not required by the original contract. But the contract so required, and this requirement ran with the subcontract. The architect so ruled; and the commissioner so decided. We think that ruling correct.

*Plastering Behind Baseboards and Wainscoting.*—The commissioner and the court below allowed the subcontractor $89.40 for plastering behind the baseboards, and $539.32 for plastering behind the wainscoting. The

theory upon which the claim was allowed is that the plans and specifications did not specifically require the plastering to be done behind the wainscoting and the baseboards, and, in the absence of such specific requirement, the custom controls, which custom is that no such plastering is done, unless required by the contract.

This claim was therefore allowed the subcontractor as an extra, but was held not to be an extra as between the contractor and the owner.

When the controversy arose over this work between the contractor and the subcontractor, the matter was submitted to the supervising architect, and he decided that the work was called for by the plans and specifications, and hence within the terms of the contract and subcontract.

The work was done by Bond & Bro. under protest.

There were quite a number of experienced plasterers, including Bond, who testified that for more than 20 years it had been the custom to only plaster down to the line of the base or the wainscoting, unless the plans and specifications indicated that the walls should be plastered to the floor.

It seems to be conceded that the plans do not indicate either that the plastering should go to the floor or that it should stop at the top of the wainscoting or the base, except in the case of the lodge room, where the details called for the plastering behind the wainscoting.

The specifications require that all interior walls and partitions should be plastered, and do not limit the plastering to the line of the wainscoting, and the architect, Wogan, testified that his plans clearly showed that the walls should be plastered behind the base and wainscoting. It was shown also that the subcontractor plastered one room behind the wainscoting, and made no extra charge therefor.

If what the architect says is to be accepted, then the specifications did call for the plastering of all walls with limitation, and the parties are to be governed accordingly.

"Where the intent of the parties is evident and lawful, neither equity nor usage can be resorted to, in order to enlarge or restrain that intent." C. C. 1963.

The contract between the Elks and Thatcher & Son provided that:

"Should any dispute arise respecting the true construction or meaning of the drawings or specifications, the same shall be decided by Messrs. Toledano, Wogan & Bernard, architects, and their decision shall be final and conclusive."

A dispute did arise as to whether this work was called for by the contract.

An appeal was made to the architect, and his decision was that the said work was not to be classed as extra, but came under the contract. There is no contention that the architect acted in bad faith or from improper motives, and there is nothing which would justify the court in holding that his decision was arbitrary.

An architect is a person skilled in the art of building, is the recognized head of the building trade, and is supposed to be skilled in the art of planning and designing structures of every description. 2 Am. & Eng. Ency. of Law, p. 815.

Where, therefore, the parties have agreed to abide by the decision of an architect, the courts will hesitate, in the interpretation of the contract, to set aside the architect's ruling, unless manifestly arbitrary, or is shown to have been rendered in bad faith.

In 6 Ruling Case Law, p. 957, it is stated that:

"In construction contracts the parties frequently insert stipulations to the effect that the completion, sufficiency, classification or amount of the work done by the contractor shall be determined by the architect. * * *

"By such stipulation the parties constitute the architect * * * an arbitrator, and the provision is held, if anything, more binding than an ordinary submission, for the reason that it enters into and becomes a part of the consideration of the contract, without which it would not in all probability have been made."

The same rule is laid down in 9 Corpus Juris, p. 772.

In O'Donnell v. Henry Forrest & Co., 44 La. Ann. 845, 11 So. 245, the court said:

"The plaintiff and the defendants having agreed, in case of disputes or differences as to the construction of their contract, or the sufficiency of the performance of any of the work to be done under it, or the price to be paid, to submit them to the civil engineer in charge, who was to consider and finally decide them, are bound by the measurements made, and by the decision of the selected arbiter."

In the case of Dugue v. Levy, 114 La. 31, 37 So. 999, the court found that the plaintiff had in some way incurred the displeasure of the supervising architect, and that the latter was disposed to be overexacting with him, and said:

"A strong case must be made out, to induce the courts to overrule the decisions of the supervising architect, but this case is of that character."

In the case of Shea v. Water Board, 124 La. 333, 50 So. 177, in construing a contract which provided that the general superintendent of the defendant board shall finally decide all matters of dispute involving the character of the work, its quantity, and the compensation therefor, the court said that:

"The authorities hereinabove quoted show that such a clause as this in a contract is binding, and that a decision under it is conclusive, in the absence of a showing that it was made in fraud or bad faith; and the plaintiff has not made such a showing."

This holding seems to be in line with the federal jurisprudence.

In the case of Plumley v. United States, 226 U. S. 545, 33 S. Ct. 139, 57 L. Ed. 342, the Supreme Court of the United States held:

"One contracting to complete an unfinished public work in accordance with the original contract and duly authorized changes is not entitled to compensation for extra work, where

the Secretary of the Interior has decided against his claim, conformably to a provision in his contract that if there be any discrepancy between plans and specifications, or between his contract and the original contract, the matter shall be referred to such Secretary, whose decision shall be conclusive."

See, also, Chicago, Santa Fé & Calif. R. v. Price, 138 U. S. 185, 11 S. Ct. 290, 34 L. Ed. 917.

*Plastering Ceiling Beams and Column Heads in Tankroom.*—In the contract, it was required that Thatcher & Son should demolish an old building which stood on the premises where the new one was to be erected. The specifications required that all of this building should be demolished, except the walls around the tankroom. In tearing down the building, the walls that were to remain were exposed to the elements, and the old plastering thereon was badly damaged. The subcontractor was required to replace the plastering on the walls, and claims the same as extra, the amount being $556.40. The commissioner allowed this claim on the theory that it was not covered by the subcontractor's contract. We are unable to agree in this conclusion. Thatcher & Son were bound to replace this old plastering, and the subcontractor assumed the same obligation. It is very appropriately suggested that the Elks contemplated a new building, and the specifications clearly contemplated that the plaster would be removed or damaged in tearing down the building. Besides, the matter was left to the architect, who ruled that the work should be done, and we have seen that his ruling is binding.

*Plastering of Tile Partitions in Basement.*— This claim amounts to $721.80, and was rejected by the commissioner as not being an extra.

The only basis for the contention that this item was an extra is that the specifications provided that the partitions should be waterproofed.

But the specifications also required that the brick walls and tile partitions should be plastered.

The tile partitions were not waterproofed, and the architect ruled that they should be plastered.

The commissioner said that because, in another place, the specifications provided that these partitions should be waterproof, did not relieve the subcontractor from the obligation to plaster them.

What we have said as to the binding effect of the decision of the architect is equally as applicable to the last two, as it is to the first two, items claimed by the subcontractor.

It is therefore ordered and decreed that the judgment of the court below, in so far as it allows Bond & Bro. $475 for furnishing and erecting hangers, and in so far as it allows Bond & Bro. $721.80 for plastering tile partitions, and in so far as said judgment approved the report of the commissioner, which allowed Bond & Bro. $556.40 for replastering ceiling beams and erecting caps and $592.05 for plastering behind base and wainscoting, be, and the same are, reversed and set aside. All four of said claims are rejected and disallowed. In all other respects, the judgment appealed from is affirmed, the appellant, and appellee Bond & Bro. to pay the cost of this appeal.

### On Rehearing.

O'NIELL, C. J. A rehearing was granted on the petition of H. W. Bond & Bro., complaining of our reversing the judgment appealed from and rejecting the demands of H. W. Bond & Bro. for the four claims, namely, $475 for furnishing and erecting hangers, $592.05 for plastering behind baseboards and wainscoting, $556.40 for plastering ceiling beams and column heads in the tankroom, and $721.80 for plastering tile partitions in the basement. We granted a rehearing in favor of John Thatcher & Son, for the reason

mainly that, if the claim of H. W. Bond & Bro. for plastering behind baseboards and wainscoting should be rejected, the judgment appealed from, in favor of H. W. Bond & Bro., should be reduced, not $592.05, as stated in the decree which we rendered, but $628.72; that is to say, $89.40 for plastering behind baseboards and $539.32 for plastering behind wainscoting. The rehearing which we granted on the petition of John Thatcher & Son, however, was not restricted in our order granting the rehearing. We have therefore considered also the two other complaints made in the application of John Thatcher & Son for a rehearing; namely, that the Benevolent Association of Elks (which is the real estate holding company for New Orleans Lodge No. 30, B. P. O. E.) should pay interest at the rate of 5 per cent. per annum on $67,684.56 from September 14, 1919, to September 11, 1920, and that John Thatcher & Son should have judgment against John Swiler for $26,120.88. We do not find any error in the opinion and decree which we rendered as to those claims; and, for the reasons which we have already given, the judgment appealed from in those respects must stand affirmed.

■ As to the four claims of H. W. Bond & Bro., our decree, reversing the judgment appealed from and rejecting the claims, was based mainly upon the clause in the original contract, between John Thatcher & Son and the Benevolent Association of Elks, declaring that the architect's decision on any dispute respecting the drawings or specifications should be final and conclusive. We were wrong in maintaining that the rulings or decisions of the architect should be binding upon H. W. Bond & Bro. in a dispute between H. W. Bond & Bro. and John Thatcher & Son. The contract between H. W. Bond & Bro. and John Thatcher & Son contained this stipulation for the settlement of any disputes that might arise between them, viz.:

"Article XXI. In case the contractor and subcontractor fail to agree in relation to any. matters under this contract, these matters shall be referred to a Board of Arbitration, consisting of one person selected by the Contractor and one person selected by the Subcontractor, these two to select a third person; the decision of any two of this Board shall be final and binding on the parties hereto. The party cast in the decision shall pay the cost of said arbitration, but, in the event that each party is allowed something on his claims, they shall share the expenses equally between them."

■ With regard to the first claim to be considered—$475 for furnishing and putting in hangers—the record discloses that John Thatcher & Son recognized that the dispute was to be determined, not by the decision of the architect, but by arbitration, under article XXI of the contract between H. W. Bond & Bro. and John Thatcher & Son. When the dispute arose, the parties entered into the following agreement, viz.:

"Whereas H. W. Bond & Bro. have entered into a contract with John Thatcher & Son to do certain work on the Elks Home in the city of New Orleans, La., according to the plans of Messrs. Toledano, Wogan & Bernard, Architects, as is set forth in the above-mentioned contract, a question has arisen as to whether the hangers for the furring to support the wire lath are to be supplied and erected by H. W. Bond & Bro., as a part of their contract, or not.

"H. W. Bond & Bro. claim that the furnishing and erecting of the hangers are not a part of their contract, and John Thatcher & Son claim that they are. In view of the foregoing, both parties agree that H. W. Bond & Bro. shall go ahead and furnish and erect the same, and that the question as to whether they are a part of their contract shall be settled by arbitration, as provided for in article XXI of the Contract between them, dated April 16, 1917." (Signed by H. W. Bond & Bro., by H. W. Bond, and by John Thatcher & Son, by Erwin H. Thatcher.)

John Thatcher & Son afterwards refused to submit the disputes between them and H. W. Bond & Bro. to arbitration; and the disputes had to be decided by the courts.

It is conceded that the contract between John Thatcher & Son and the Benevolent Association of Elks required the contractor

to furnish and put in the hangers to support the wire lath. The only question is whether the contract between H. W. Bond & Bro. and John Thatcher & Son required H. W. Bond & Bro. to furnish and install the hangers. The contract specifically required H. W. Bond & Bro. to do the furring and lathing, and to furnish the material therefor, but did not mention hangers. Four witnesses besides H. W. Bond, all reputable plastering contractors, testified that the custom of the trade was for the general contractor to install the hangers, which could be done at a very slight cost during the pouring of the concrete. The testimony leaves no doubt that subcontractors, in bidding on plastering, never contemplate putting in hangers, but always figure on their being put in by the general contractor, unless it is otherwise stipulated in the contract between the subcontractor and the general contractor. Our conclusion, therefore, is that the claim of H. W. Bond & Bro. for the extra work of putting in the hangers is well founded, and that the judgment appealed from in that respect is correct.

■ The next item is the claim for $556.40 for plastering behind baseboards and wainscoting. When the dispute arose between H. W. Bond & Bro. and John Thatcher & Son, the latter again acknowledged that the matter should be determined, not by the decision of the architect, but by arbitration, according to article XXI of the contract between H. W. Bond & Bro. and John Thatcher & Son. H. W. Bond & Bro. wrote John Thatcher & Son, insisting that plastering behind baseboards and wainscoting was not called for by either the plans or the specifications, and refused to do the work without additional pay. John Thatcher & Son, being bound by the decision of the architect, replied:

"W. H. Bond & Bro., City—Gentlemen: In reply to yours of the 4th instant in reference to plastering behind wainscoting at the Elks Home, would say that we do not agree with you, but it is agreeable to us that you shall proceed and do this work and that any contention regarding same shall be settled under article 21 of our contract.
"Yours very truly,    John Thatcher & Son,
    "Per Erwin H. Thatcher, President."

Our decision reversing the ruling of the commissioner and of the civil district court as to this claim was based entirely upon the supposition that the decision of the architect was binding upon H. W. Bond & Bro., as well as upon John Thatcher & Son. We observed that the plans and specifications did not indicate that plastering should be done behind baseboards or wainscoting; and we observed that:

"There were quite a number of experienced plasterers, including Bond, who testified that, for 20 years, it had been the custom to plaster only down to the line of the base or the wainscoting, unless the plans and specification indicated the walls should be plastered to the floor."

There is therefore no doubt that H. W. Bond & Bro. bid on the job and entered into the contract to do the plastering at a price which did not include or contemplate plastering behind baseboards or wainscoting; and, since they are not bound by the ruling of the architect on the subject, there is no reason whatever for denying them the extra cost of this work. The judgment of the civil district court, affirming the report of the commissioner, in that respect, is correct.

■ The claim for $556.40 for plastering ceiling beams and column heads in the tank-room was allowed by the commissioner, and the allowance was affirmed by the civil district court. The plans and specifications called for the demolishing of an old building, except the two walls and ceiling of the tank-room, and required the general contractor, John Thatcher & Son, to protect the retained walls and ceiling against damage by weather. There was no obligation on the part of H. W. Bond & Bro., any more than on the part of any other subcontractor, to protect the retained walls and ceiling from the elements.

John Thatcher & Son did protect them for some time, but afterwards neglected them, in consequence of which the old plastering was damaged by the weather, and the walls and ceiling had to be replastered. It is true that H. W. Bond & Bro. had to do all of the work called for by the original contract under the heading "Plastering," but the protecting or replastering of the walls and ceiling of the old tankroom was not covered by the heading "Plastering," but was included under the heading "Demolishing," which H. W. Bond & Bro. had nothing to do with. There is, therefore, no reason why H. W. Bond & Bro. should suffer the loss of the cost of replastering the retained walls and ceiling of the tankroom, which were damaged through the fault or negligence of the general contractor. The judgment of the civil district court affirming the report of the commissioner in that respect is correct.

As to the claim for $721.80 for plastering the tile partitions in the basement, it is not disputed that the specifications called for waterproofing all tile partitions in the basement; and, the fact is, that they were not waterproofed. The testimony shows— and it is not disputed—that, if these tile partitions had been waterproofed, they could not have been plastered. The architect decided that the tile partitions in the basement should be plastered, instead of being waterproof. His only authority therefor was a clause in the specifications, referring to walls generally, and saying that they should be plastered; which, in our opinion, did not control the specifications referring particularly to the tile partitions in the basement and requiring that they should be waterproof. The subcontractor who bid on the waterproofing, perhaps, got the benefit of the decision of the architect that the tile partitions in the basement should be plastered instead of being waterproofed; but there is no rea-

son why H. W. Bond & Bro., who bid only on the plastering, should suffer the consequence of the ruling of the architect that the tile partitions in the basement should be plastered instead of being waterproof, as specified in the contract. Our original ruling on this claim was based mainly, if not entirely, upon the erroneous supposition that the decision of the architect, requiring the tile partitions in the basement to be plastered instead of being waterproof, was binding upon H. W. Bond & Bro. The judgment of the civil district court allowing the claim of H. W. Bond & Bro. for the extra cost of plastering the tile partitions in the basement is correct.

The judgment heretofore rendered by this court having been set aside by the granting of a rehearing, the judgment appealed from is now affirmed.

THOMPSON, J. (concurring). The original opinion in this case was written on the assumption that the subcontractor, Bond & Bro., had subscribed to the provision contained in the original building contract to the effect that all disputes as to the plans and specifications should be decided by the architect, and his decision should be final.

That assumption was apparently justified by reason of the fact that it was so claimed in the brief of Thatcher & Son, and not controverted in the brief of Bond & Bro.

It developed on the rehearing, however, that Bond & Bro. was not bound by the provision referred to, but, on the contrary, the subcontract expressly provided that, when the contractor and subcontractor could not agree in relation to matters under the subcontract, those matters should be referred to a board of arbitration, consisting of three persons selected as therein provided, the decision of a majority of whom should be final.

I am therefore in a position to concur in the decree on rehearing. Otherwise I would adhere to the original opinion.