[Civ. No. 24055.   First Dist., Div. Two.   June 26, 1968.]

WALNUT CREEK ELECTRIC, Plaintiff, Cross-defendant and Appellant, v. REYNOLDS CONSTRUCTION CO., INC., et al., Defendants, Cross-complainants and Respondents; ACALANES UNION HIGH SCHOOL DISTRICT, Cross-defendant and Respondent.

John R. Forde, Jr., for Plaintiff, Cross-defendant and Appellant.

Bohnert, Flowers & McCarthy and Frederick W. Flowers for Defendants, Cross-complainants and Respondents.

No appearance for Cross-defendant and Respondent.

TAYLOR, J.—This is an appeal by plaintiff, Walnut Creek Electric, from that portion of a judgment denying recovery of $4,528.18 for the ''extra'' work of ''wrapping'' certain electrical conduits. Plaintiff was the electrical subcontractor for the additions to the Del Valle High School in Contra Costa County built by the general contractor, respondent, Reynolds Construction Co., for the owner, Acalanes Union High School District. Respondent, American Casualty Company, the surety on Reynolds' labor, performance and material bond, is the assignee of all funds due to Reynolds from the school district.

Plaintiff asserts that the trial court erroneously concluded that it was bound by the determination of the school district's architect that the ''wrapping'' of the conduits was required by the contract plans and specifications and that extra compensation could not be allowed therefor.

The basic facts are not in dispute. During the course of its performance, plaintiff was requested by a representative of the school district to ''wrap'' the conduit pipes laid in gravel fill underneath the concrete slab of the building. Before doing so, plaintiff raised with the school district's architect, Banwell, the question of whether or not this work was encompassed within the original subcontract price in accordance with the plans and specifications. Banwell sought and obtained the expert opinion of Laib, the licensed electrical engineer employed by him as a consultant on the project. The electrical specifications were prepared by Banwell at the direction of Laib. Laib's letter to Banwell indicated that the ''wrapping'' was included in the specifications. Banwell agreed and wrote to plaintiff that the unwrapped conduits would not be accepted. Thereafter, plaintiff did the ''wrapping'' under protest and billed Reynolds for an extra amount of $4,528.18. After Reynolds rejected this claim, plaintiff filed this action to recover that amount plus an additional small sum for other minor extras, a total of $5,113.26.

The crux of the controversy is the meaning of the word

"underground" in specification EL-8, which provides, so far as pertinent: "All conduits installed underground shall be corrosion-protected with a factory-applied polyvinyl chloride coating of .020 inches minimum thickness." Plaintiff asserts that as used above, "conduits installed underground" refers only to conduits under the surface of the earth and in direct contact with the soil—not conduits in gravel under a concrete slab.

Laib and Banwell testified that the purpose of "wrapping" is corrosion protection and that since the moisture from the soil is one of the basic causes of corrosion and can seep up through gravel, the term "underground" as used in the specification would be defined as anything in contact with the soil, including contact with the soil through a layer of gravel. Laib testified that he knew of no custom or usage in the electrical industry concerning specifications for conduits under concrete slabs, and that he was aware, when preparing the specifications with Banwell, that sometimes, conduit specifications were written with distinctions between conduits in gravel fill under concrete slabs and conduits directly in contact with earth.

Laib's electrical engineering firm, with its extensive experience on public projects, had used a specification identical to the one here involved on a prior phase of the Del Valle High School, as well as two high schools in San Mateo County, and encountered no problems about the "wrapping." The firm had also drafted a specification similar to that drafted by another firm for the Pittsburg Junior High School referring to "conduits . . . in soil . . . or in contact with soil . . ." After the problem developed in the instant case, to avoid other misunderstandings, Laib's firm recommended a special addendum to a specification identical to the one here involved, for the subsequent Rheem High School job as follows: "Conduit installed *below concrete slab as well as underground* shall be corrosion-protected as specified." (Italics added.)

Plaintiff's witnesses testified that the general practice in the county was to "wrap" all underground conduits, but conduits under concrete slabs only when this was definitely spelled out in the language other than the term "underground," such as "including conduit in slab or under slab." Plaintiff introduced into evidence the specifications for the Park Junior High School, Highlands Elementary School,

Pittsburg Junior High, and Rheem High School, that made such a distinction. All of these projects except Rheem involved other architects and electrical engineers.

Plaintiff's witnesses further testified that because of the custom in the county, its computations in bidding on the subcontract, distinguished between conduit installed underground and conduit under the concrete slab and did not include the "wrapping" of the 3,070 feet here in dispute. This distinction made sense to plaintiff as the purpose of the "wrapping" is not to keep the moisture out but protect the outside of the pipe from corrosion caused by the electrolysis that occurs when different soils come in contact with each other. Although the moisture in the soil could rise up through the gravel to the conduit, the corrosion problem is caused not so much by the moisture but by the currents resulting from the electrolysis of dissimilar soils. The conduits under the concrete slab here were subject to moisture but not such electrical action.[1]

The evidence thus clearly established that the conduit specification here in question was ambiguous, to say the least. The trial court did not independently interpret the specification[2] but found that "Part of the terms agreed to by plaintiff by way of its subcontract and of the contract and plans and specifications was that the architect's determination would be final"; and that plaintiff was thus bound to supply the "wrapping" as there was no fraud or mistake or bad faith or failure to exercise honest judgment on the part of the architect.

Plaintiff challenges these findings by pointing out that there was no clause making the architect the final arbiter in the determination of intent and meaning of the subcontract and the plans and specifications prescribing the work to be performed.

Respondent relies on the first paragraph of the subcontract which provided that plaintiff would perform and complete the

---

[1] A somewhat dubious distinction since electrolysis (the process of producing chemical changes by passage of an electric current) necessarily implies the presence of moisture to provide a conductor for the current.

[2] We cannot accept respondent's argument that the trial court made an independent interpretation of the subcontract in finding 9. Finding 9 must be construed in context with the other findings and the court's memorandum of decision, which makes it clear that the court relied on the ruling in *C. J. Wood, Inc.* v. *Sequoia Union High School Dist.*, 199 Cal.App.2d 433 [18 Cal.Rptr. 647], and that its conclusion is based on the architect's determination.

electric work "according to the plans and specifications . . . and to the full satisfaction of said Architect." It cites *C. J. Wood, Inc.* v. *Sequoia Union High School Dist.*, 199 Cal.App. 2d 433, 435 [18 Cal.Rptr. 647], and other similar authorities, where the agreement of the parties specifically provides that the determination of a third party (usually the architect or engineer) shall be final as to the meaning or interpretation of the plans and specifications.[3] We have no quarrel with the rule stated in *Wood,* that under such "third party" provisions, the decision of the architect would be conclusive in the absence of fraud or gross mistake. Such provisions have been held to give the third party the power to resolve any ambiguities in the specifications (*McBride Elec. Co.* v. *United States* (1916) 51 Ct.Cl. 448).

In the instant case, however, there was no such clearly expressed provision in either the subcontract or the plans and specifications.[4] The subcontract merely provided that the work was to be done *in a good, thorough and workmanlike manner* in accord with the plans and specifications and *to the satisfaction of the architect.* This latter provision concerns the architect's authority to pass upon matters of the quality and quantity of performance (*Hagginwood Sanitary Dist.* v. *Downer Corp.*, 179 Cal.App.2d 756 [3 Cal.Rptr. 873]; *Moore* v. *Kerr*, 65 Cal. 519 [4 P. 542]). It does not purport to give him final and sole authority to make a legal interpretation of the subcontract or to resolve ambiguities in the plans and specifications. This kind of power cannot be inferred but must be unequivocally expressed (*Fritz Jahncke, Inc.* v. *Fidelity & Deposit Co.* (1928) 166 La. 593 [117 So. 729, 734]).[5]

In the absence of such expressed contractual authority in the architect, the trial court, pursuant to a well-established rule, was required to construe the ambiguity against respondent, whose agents caused the uncertainty to exist (Civ. Code, § 1654; *Marshall & Co.* v. *Weisel*, 242 Cal.App.2d 191 [51

[3] For compilations of pertinent cases, see 54 A.L.R. 1255, 110 A.L.R. 137, and 137 A.L.R. 530.

[4] Since the subcontract referred to the plans and specifications, they become a part of the subcontract for all purposes (*Holbrook* v. *Fazio,* 84 Cal.App.2d 700, 701 [191 P.2d 123]). The prime contract was never introduced into evidence, and we conclude that the court's finding was obviously not based on any such "third party" provision in the prime contract.

[5] Although the contract contained an arbitration clause, neither party asked for arbitration and the respondent in its brief states that the arbitration clause "has no application to the issue involved."

Cal.Rptr. 183]; *Department of Water & Power* v. *Okonite-Callender etc. Co.* (9th Cir. 1950) 181 F.2d 375 [24 A.L.R.2d 917]). The record shows that the testimony was conflicting as to the necessity of the "wrapping" to avoid corrosion, that there was undisputed evidence that the term "underground," as used here, had no technical meaning indicated by custom or usage in the drafting of conduit specifications, and that the practice in the county was to distinguish between the two types of conduits. Furthermore, in the absence of a technical meaning, words are to be interpreted in their ordinary and popular sense (Civ. Code, § 1644) and Webster defines "underground" as "beneath the surface of the earth." Thus, a reasonable interpretation of the specification in question, favorable to appellant who did not draft it, is that while the conduit in question was beneath the floor slab, it was not "underground."

The *Okonite* case, cited above, is in point. It involved the interpretation of an "escalator" clause in the specifications whereby the base price specified in the bids was to be adjusted for changes in material costs. The clause provided that adjustments would be based on the index of wholesale prices for Group VI-Metals and Metal Products compiled monthly by the U.S. Department of Labor. The monthly compilations of the Department of Labor, however, gave two sets of figures and a dispute arose as to which set was meant. As in the instant case, there was no provision making the determination of a third party final as to the meaning of the escalator clause. The court construed the ambiguous provision against the draftsman, the City, and permitted the contractor to recover the extra amount due.

The judgment is ordered modified to include the amount of the extra due to the conduit "wrapping," in accordance with the views expressed in this opinion, together with costs and attorneys' fees pursuant to Government Code section 4207. As so modified, the judgment is affirmed. Appellant to recover costs on appeal from American Casualty Company.

Shoemaker, P. J., and Agee, J., concurred.