[L. A. No. 10532. In Bank.—September 29, 1930.]

LOS ANGELES DREDGING COMPANY (a Corporation), Respondent, v. CITY OF LONG BEACH (a Municipal Corporation), Appellant.

APPEAL from a judgment of the Superior Court of Los Angeles County. Percy Hight, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Howland M. Reid, City Attorney, and Geo. W. Trammell, Jr., Assistant City Attorney, for Appellant.

Denio, Hart, Taubman & Simpson, Geo. P. Taubman, Jr., and Mathew C. Simpson for Respondent.

LANGDON, J.—This is an appeal from a judgment of the Superior Court of Los Angeles County, in favor of plaintiff, for money due under two contracts.

On February 18, 1924, the city manager of defendant published a notice inviting bids for the dredging of a certain channel in Long Beach harbor. Plaintiff corporation filed its bid for the work and on March 19, 1924, a contract was entered into between plaintiff and defendant for the dredging of the said channel in accordance with specifications set forth in the published notice and incorporated into the contract by reference. The contract provided, among other things, that the plaintiff should diligently prosecute the work and complete it on or before January 9, 1926; that a certain proportion of the work should be completed at the end of each month; that the plant of plaintiff should be of sufficient size to meet the requirements of the work, and should be kept at all times in condition for efficient work. It was also agreed that the city engineer would permit the laying of a pipe-line on public streets and across public lands.

The present action is not concerned with this original contract, but with two oral contracts subsequently made by the city manager of defendant with plaintiff, and thereafter ratified by the city council of defendant. The circumstances giving rise to these contracts are hereinafter set forth.

Plaintiff commenced to perform and continued to do so in full compliance with the terms of its contract up to about July 21, 1925. At this time the bathing season of the city was at its height, and the depositing of dredged materials in the places and in the manner specified resulted in pollu-

tion of the waters and interfered with the use of the beach for bathing purposes. Thereupon, on or about the said date of July 21, 1925, the city manager of defendant entered into an oral contract with plaintiff, whereby it was agreed that if plaintiff would cease its dredging operations at such times as directed, defendant would pay to plaintiff for the time lost by such cessation the sum of $30 per hour. It was stipulated, and the court found that it was necessary for plaintiff to maintain its plant ready for work during such cessation of operations; that the reasonable cost therefor, including wages, insurance and overhead, was the said sum of $30 per hour; and that it had been agreed between the city manager and plaintiff that the said sum of $30 was reasonable. Pursuant to this agreement plaintiff ceased its dredging operations at various times during the months of July and August, 1925, for a total of 380¾ hours.

The second contract upon which this action is brought had its origin as follows: In accordance with the provisions of the dredging contract, plaintiff had laid its pipe-lines along public streets and ways within the city in order to obtain the shortest route for transporting dredged materials from the place of operation to the place of disposal. The parties stipulated that at the time of the bid and original contract plaintiff relied upon the representations of defendant that the use of public streets and ways would be given. The findings of the court state that subsequently, "on or about the 1st day of April, 1925, the use of the public streets and ways within the City of Long Beach was refused plaintiff herein by defendant, by reason of the fact that the normal leakage and overflow from said pipe-lines would so hinder and obstruct the use of the public streets and ways for normal use as to be detrimental to the health and safety of those so using said public streets and ways, and that certain of the citizens of defendant threatened to enjoin the dredging operations of plaintiff and defendant; and that by reason of said refusal, and at the request of defendant, it was necessary for plaintiff and plaintiff was forced to obtain rights of way over other lands to transport dredged materials over and through greater lengths of pipe and distances than originally contemplated when its said bid was made and accepted." At the time of the request to change the route the city manager

of defendant entered into another oral agreement with plaintiff to pay the additional cost of transporting the dredged materials over the more circuitous route at the rate of 1.5 cents per yard over and above the contract price. The court found that such sum was the reasonable additional cost to plaintiff of the said change of route.

During the months of April, May, June, July and August, 1925, plaintiff transported 373,439 yards of dredged materials over such increased distance.

The charter of the City of Long Beach contains the following provision relevant to the situation herein presented:

"Sec. 294. All contracts, except as otherwise provided in this charter, or by general law, for the city or any of the departments or public institutions thereof, must be made by the City Manager with the lowest responsible bidder, whose bid is in regular form, not less than five days nor more than twenty days after one publication of a notice calling for bids in the official newspaper of the city; said notice shall contain a brief description of the supplies or materials required and amount of the bonds required of the successful bidder, and state the hour and day on which said bids will be opened; except, that the City Council may, by a resolution adopted by the affirmative vote of five members of the City Council, authorize the City Manager to enter into a contract on behalf of the city, in writing or otherwise, without advertising for bids, for labor, material or supplies for actual emergency work."

On or about January 28, 1927, the city council of defendant passed a resolution ratifying and confirming on behalf of the city, the contract for cessation of dredging operations and the contract for the payment of the additional sum per yard for materials transported over the longer route. The resolution reads in part as follows:

"Section 1. That the several contracts hereinafter particularly described, entered into by the City Manager of the City of Long Beach, on behalf of the City of Long Beach, and acting as such official, and not otherwise, on the one hand, and the Los Angeles Dredging Company, a corporation, on the other hand, without advertising for bids, are hereby authorized, ratified and confirmed as and for the actual emergency work as hereinafter described at the price

thereof, and as and of the dates when each of said agreements was made.''

Section 4 of the resolution states that ''it was impracticable to advertise for bids for such contracts as Los Angeles Dredging Company had already the contracts for said work; that it would be a useless and futile act to ask for bids on such contracts, as none except Los Angeles Dredging Company could or would bid thereon.''

The said resolution was passed by the affirmative vote of five members of the council.

Subsequently plaintiff presented its claim to defendant for the sums due under the contracts. The claim was not allowed. This action was thereupon commenced on May 28, 1927. The complaint contained thirty-four causes of action. The first count was for the agreed cost of cessation of dredging operations for the period of 380¾ hours, on the theory of a single agreement therefor. Counts two to thirty-three, inclusive, were for such costs on each day during the period, on the theory of a separate agreement for each day. The thirty-fourth count was for the transportation of dredged materials through the increased pipe length.

The case was submitted on a written stipulation of facts. Judgment was given for plaintiff on the first and thirty-fourth causes of action, in the sum of $17,024.08, with interest thereon from January 28, 1927, the date of the resolution ratifying the contracts, together with plaintiff's costs. Defendant then brought this appeal.

Certain general principles have become well established with respect to municipal contracts, and a brief statement of these principles will serve to narrow the field of our inquiry here. ▮ The most important one is that contracts wholly beyond the powers of a municipality are void. They cannot be ratified; no estoppel to deny their validity can be invoked against the municipality; and ordinarily no recovery in *quasi* contract can be had for work performed under them. ▮ It is also settled that the mode of contracting, as prescribed by the municipal charter, is the measure of the power to contract; and a contract made in disregard of the prescribed mode is unenforceable. (*Reams v. Cooley*, 171 Cal. 150 [Ann. Cas. 1917A, 1260, 152 Pac. 293]; *Zottman* v. *San Francisco*, 20 Cal. 96 [81 Am. Dec. 96]; 1 Dillon on Municipal Corporations, 5th ed., 448, sec.

237; 3 McQuillin on Municipal Corporations, 2d ed., 798, sec. 1266; 19 R. C. L. 1063, sec. 352; 18 Cal. Jur. 1002, sec. 273.)

The charter of the City of Long Beach lays down the general requirement that all contracts, except as otherwise provided in the charter or by general law, must be made by the city manager with the lowest responsible bidder. In the instant case, the contracts were made without the letting of bids. This fact renders them void unless they come within some exception to the rule set forth above. There are two well-recognized exceptions which are, we think, applicable to this situation.

The first exception is founded on the fact that sometimes it is undesirable· or impossible to advertise for bids for particular work. In such cases the statutory requirement is deemed not to apply. In 2 Dillon on Municipal Corporations, 1199, section 802, the law is thus stated: "It has been held that where competitive proposals work an incongruity and are unavailing as affecting the final result, or where they do not produce any advantage . . . or it is practically impossible to obtain what is required and observe such forms, a statute requiring competitive bidding does not apply." Our courts have approved this doctrine. (*Los Angeles Gas & E. Corp.* v. *Los Angeles,* 188 Cal. 307 [205 Pac. 125]; *Miller* v. *Boyle,* 43 Cal. App. 39 [184 Pac. 421].) The reason for the exception is fully discussed in the case of *Harlem Gaslight Co.* v. *Mayor etc. of New York,* 33 N. Y. 309, where the court says (p. 329): "Competitive offers or bids have no other object but to insure economy and exclude favoritism and corruption in the furnishing of labor, services, property and materials for the uses of the city. This was the purpose and the only purpose of the framers of the statutes, and when they have this effect given to them, nothing further is needed. They are not to have such a construction as to defeat this purpose, to impede the usual and regular progress of the public business, or to deprive the inhabitants, even temporarily, of those things necessary and indispensable to their subsistence, their health, or the security and protection of their persons or property. Contingencies may arise when services, materials and property, above the prescribed value, may be *immediately needed,* and where competitive offers and written contracts would

be unserviceable or impossible. In such a case the statutes would not apply, because such application could not have been intended. Whenever the nature of the service, or of the property needed for the public uses, or the time within which it must be had to prevent irreparable mischief under competitive offers is impossible, then the provisions of the acts referred to cannot apply because such could not have been the intention of the law makers, and such emergencies were not amongst the mischiefs which the provisions referred to were designed to correct. . . . In the case we are considering, the case shows that the plaintiff's mains and conductors were the only things of the kind laid down in the streets of the city north of the center of 79th street, and that there was no other individual company or corporation having the ability and the means to supply the city with illuminating gas to light the streets. Knowing this the common council, in granting to the Harlem Company the privilege of occupying the streets with their mains, did so upon condition that the latter should supply the streets of the city with gas for street purposes, within two years from the time of the passage of the resolutions. This condition is wholly inconsistent with the idea of competition from several bidders, and the contract awarded to him whose offer was the best for the city. Had the common council, in place of this condition, invited proposals in the usual form, there could have been but a single offer at best, and the provisions of the statutes would have failed of effect because they were not applicable to such a subject."

The contracts involved in this action are obviously of such a nature that bidding would be impossible. The plaintiff, as the original contractor, was the only party that could enter into such agreements with the city. Hence it is clear that these contracts, by implication, are not within the charter requirement of competitive bidding. ▆▆ It seems equally clear that this contract comes within another exception to the general rule. The charter provision already quoted makes an *express exemption* from the requirement of bidding in the case of contracts for "labor, material, or supplies for actual emergency work"; and proceeds to specify the manner in which these exceptional types shall be made. We think this provision is applicable to the contracts in question, for two reasons: First, it would seem that

contracts which are, by their nature, impliedly exempt from the bidding requirement, should be no more free from protective restrictions than are those which are, by the terms of the charter, expressly exempted. They should, as a matter of sound policy, be governed by the same restrictions as to the mode of contracting. Second, in our view, the contracts which we are considering come not only within the implied exemption, but within the express exemption as well. In other words, they are contracts for "actual emergency work" within the meaning of the charter.

■ Defendant's contention that the contracts are not for *work* but for *cessation of work* is obviously contrary to the facts. The first contract required plaintiff to maintain its plant, that is, labor, material and supplies, for a longer time than originally required, and at an additional cost. The second contract required plaintiff to take up its old pipelines, lay them over a different and longer route, and operate at an increased cost. There can be no question but that this part of the charter provision is fully complied with.

■ The more difficult problem is whether the contracts were, in fact, emergency contracts. To state what constitutes an emergency is not an easy task. The term depends greatly upon the special circumstances of each case; and the authorities are not very helpful in the present inquiry. By definition, the term "emergency" implies a sudden or unexpected necessity requiring speedy action. (*San Christina Inv. Co.* v. *San Francisco,* 167 Cal. 762, 773 [52 L. R. A. (N. S.) 676, 141 Pac. 384]; *Spreckels* v. *San Francisco,* 76 Cal. App. 267 [244 Pac. 919]; *Mallon* v. *Board of Water Commrs.,* 144 Mo. App. 104 [128 S. W. 764].) Instances of judicial recognition of emergencies may be found in *North River Elec. L. & P. Co.* v. *City of New York,* 48 App. Div. 14 [62 N. Y. Supp. 726], where the necessity of securing street lighting was held to be an emergency which dispensed with the ordinary formal requirements of a municipal contract; and in *Sheehan* v. *City of New York,* 37 Misc. Rep. 432 [75 N. Y. Supp. 802], where the immediate possibility of frost was held to constitute an emergency which justified a contract for materials to construct a greenhouse. (See, also, 2 Dillon on Municipal Corporations, 5th

ed., sec. 802; 3 McQuillin on Municipal Corporations, 2d ed., sec. 1295.)

Defendant's denial of the existence of an emergency is based upon the contention that the plaintiff, under its original contract, was already under a duty to guard against the circumstances which gave rise to this alleged emergency. It is pointed out that the specifications contain an agreement by the contractor to be fully responsible for any damage or injury resulting from performance of the work. Reference is also made to the provisions of the contract which require the contractor to keep the pipe-line in good condition and to repair leaks promptly. It is then argued that the conditions described as emergencies are merely the result of plaintiff's violation of its contractual obligations, and that the pollution of the beaches and obstructions of the streets in such a manner as to be dangerous to health and safety are, in addition, violations of law for which the city could not agree to make compensation.

We do not think that this is the effect of the contract. That the contractor assumed responsibility for the results of its own negligence is plain; but that it did not assume responsibility for any and all results which might follow from a proper performance of the terms of the contract is equally plain. The contract required plaintiff to dredge in a certain place, and to deposit the dredged materials in a certain place. It also fixed a time for completion of the work and required a certain amount of performance each month. A strict and careful compliance with its terms made the beaches dangerous to health and unsuitable for use. This circumstance was the fault of the city, and not the contractor. The emergency was one for which no responsibility could attach to plaintiff. Similarly the original contract gave plaintiff the right to lay its pipes along the streets, and this right was of such value as materially to affect the amount of the bid. The placing of the pipes thereon and their normal leakage interfered to some extent with the use of the streets. That the contractor was obligated to keep them in repair did not alter the situation. Even the most diligent attention could not eliminate some leakage from pipes of this type, nor could attention alter the fact of their actual obstruction of the streets. There is nothing in the record which suggests any lack of care on the

part of plaintiff, and this sufficiently disposes of the argument that plaintiff was responsible for whatever danger existed.

It appears, then, that a certain menace to the health of persons in the city and an interference with their ordinary use of the streets and beaches resulted from the proper performance by plaintiff of the terms of a contract prepared by defendant. There is nothing in the record to indicate that this result was foreseen. It seems obvious that it was not, for neither party gained anything by the new contracts; the additional compensation was solely for the increased cost of the change in plans. The contract required many months of dredging, and this incidental effect was apparently overlooked or minimized by defendant.

█ To the above may be added the compelling weight of the resolution of the city council, already quoted. The resolution recites the facts, and declares them to constitute an emergency. Such a declaration, though not conclusive, is *prima facie* evidence of the existence of an emergency, and places the burden on the party attacking the recital. (*Morgan* v. *Long Beach,* 57 Cal. App. 134 [207 Pac. 53]; *In re Strotham,* 45 Cal. App. 436 [187 Pac. 986].) Defendant has failed to meet this burden with any evidence; and its argument, discussed above, is not only unconvincing in itself, but quite insufficient to overthrow the presumption arising from the recital in the resolution. As the court says in *Morgan* v. *Long Beach, supra,* at page 138 of 57 Cal. App: "In the absence of evidence to the contrary, however, we must assume that the council acted upon sufficient inquiry as to whether or not an emergency existed. The declaration is *prima facie* evidence of such fact."

One final question remains. The charter specifies the manner in which emergency contracts may be made without the necessity of competitive bidding. It requires that the city manager be authorized by a resolution and affirmative vote of five members of the council. At the time these contracts were made, no such resolution or vote took place. At such time, therefore, the city manager was without authority to enter into them and they were unenforceable. Thereafter, the city council expressly confirmed his authority and ratified the contracts in the manner prescribed, that is, by resolution and affirmative vote of five members. The

question is whether this ratification transformed these unenforceable agreements into binding obligations.

■ The rule that a void municipal contract cannot be ratified is, as already pointed out, confined to contracts which are beyond the powers of the municipality, or those in which some prescribed formality has irrevocably been disregarded. Such contracts cannot be ratified for a two-fold reason: Ratification must be based upon a previously existing power to make the particular contract; and ratification must be made in the manner prescribed for the making of such contract. Where a municipality has no original power to enter into a particular type of contract, it lacks power to ratify it after performance. And where the contract is one which, though within the powers of the municipality, requires the formality of advertising for bids, and such contract is let without compliance with the requirement, it is not subject to ratification because the mode of entering into it has *irrevocably been disregarded*. There is no longer any possibility of compliance with the requirement of competitive bidding. Hence it is impossible to ratify the contract *in the manner prescribed for the making of the contract*, and the attempted ratification is of no effect. The courts have usually given the fullest effect to these salutary rules limiting the ratification of municipal contracts, for the purpose of protecting municipalities from a disregard of important charter provisions.

■ But while municipalities should receive the full protection of the limitations thus placed upon the doctrine of ratification, there is no reason why the doctrine should be repudiated where municipalities are concerned. And to repudiate the doctrine is, in effect, precisely what defendant asks this court to do. The contracts were of a type which the city undoubtedly had power to make. The requirement of competitive bidding did not apply to them because the letting of bids would be useless and impossible, and because they were emergency contracts, and exempt from the requirement by the express provisions of the charter. The only requirement that did apply was that the city manager be authorized by resolution and affirmative vote of five members of the council. The resolution was ultimately adopted by such a vote. In other words, the contracts were within the powers of the municipality, and the ratification was in

the manner prescribed for the making of the contract. Upon such ratification the contracts became binding upon the city as fully as though they had been previously entered into in the prescribed manner.

These conclusions are fully supported by the authorities, and even in decisions which hold particular contracts void and not subject to ratification, we find the proper distinction made. Thus, in the leading case of *Zottman* v. *San Francisco*, 20 Cal. 96, Mr. Justice Field says at page 102 [81 Am. Dec. 96]:

"As a necessary consequence flowing from these views, a contract not made in the prescribed mode cannot be affirmed and ratified *in disregard of that mode* by any subsequent action of the corporate authorities and a liability be thereby fastened upon the corporation. *Ratification is equivalent to a previous authority; it operates upon the contract in the same manner as though the authority to make the contract had existed originally.* The power to ratify, therefore, necessarily supposes the power to make the contract in the first instance; and *the power to ratify in a given mode supposes the power to contract in the same way.* Therefore, where the charter of a city authorizes a sale of city property only at public auction, a sale not thus made is *from its very nature incapable of ratification, because it could not have been otherwise made originally.* So where the charter authorizes a contract for work to be given only to the lowest bidder, after notice of the contemplated work in the public journals, a contract made in any other way—that is, given to any other person than such lowest bidder—cannot be subsequently affirmed. Were this not so, the corporate authorities would be able to do retroactively *what they are prohibited from doing originally.* We had occasion, in the case of *McCracken* v. *The City of San Francisco,* to give to this subject great consideration, and we there held that *where authority to do a particular act can only be exercised in a particular form or mode, the ratification must follow such form or mode and that a ratification can only be made when the principal possesses at the time the power to do the act ratified.*" (Italics ours.)

It is apparent that the ratification in this case fully complies with the conditions stated in the foregoing quotation; and that this quotation correctly states the law may be seen

from an examination of other decisions. In *People* v. *Swift*, 31 Cal. 26, at page 28, the court says: "This subsequent ratification by the board, within their powers, and according to the method of contracting pointed out in the charter, bound the city as effectually as an employment in advance would have done. (*McCracken* v. *San Francisco*, 16 Cal. 592; *Zottman* v. *San Francisco*, 20 Cal. 96 [81 Am. Dec. 96].)" In *Warren Brothers Co.* v. *Boyle*, 42 Cal. App. 246, at page 260 [183 Pac. 706, 711], the court makes a similar statement: "As an ordinance was necessary in the first instance to inaugurate the work, it was proper that the ratification be in the form required in the original act. When passed its effect was equivalent to a previous authority. It operated upon the action of the board of public works as though the authority had originally been given." In *Iverson* v. *Williams School Dist.*, 42 N. D. 622 [172 N. W. 818, 821], the court says: "Municipal corporations . . . may ratify contracts made in their behalf which they possess authority to make. See *State* v. *Cowgill & Hill Mill Co.*, 156 Mo. 620 [57 S. W. 1008]; *Sullivan et al.* v. *School District No. 39*, 39 Kan. 347 [18 Pac. 287]; L. R. A. 1915A, 1028, note. The ratification, however, cannot be given a retroactive effect which would enable the corporation to escape compliance with essential preliminary requirements. . . . In the instant case the only requirement lacking at the time the contract was made was a vote of the electors resulting in the selection of a particular site, and the statute has since been amply satisfied in this respect." To the same effect are many other authorities. (See *Frank* v. *Board of Education*, 90 N. J. L. 273 [L. R. A. 1917D, 206, 100 Atl. 211]; *Tracy Cement Tile Co.* v. *City of Tracy*, 143 Minn. 415 [176 N. W. 189]; 2 Dillon on Municipal Corporations, 5th ed., 1190, sec. 797; Cooley on Municipal Corporations, p. 253, sec. 78; 1 Mechem on Agency, 2d ed., 270, sec. 367; 3 Page on Contracts 3075, sec. 1790; 19 R. C. L. 1074, sec. 360; and cases collected in note, L. R. A. 1915A, p. 1023.)

It must be concluded that the contracts, upon their ratification by the city council, became binding upon defendant.

One part of the judgment must, however, be modified. Plaintiff recovered judgment in the sum of $17,024.08, plus interest from January 28, 1927, the date of the resolu-

tion of the city council. Plaintiff concedes the correctness of the rule that in the absence of special statutory authorization, interest cannot be recovered against the state or a municipality. (*Reclamation Dist. No. 1500* v. *Reclamation Board,* 197 Cal. 482 [241 Pac. 552]; *Engebretson* v. *City of San Diego,* 185 Cal. 475 [197 Pac. 651].) Interest is recoverable in this case only from December 10, 1927, the date when judgment was rendered. The judgment is therefore modified to substitute for the words "interest thereon from the 28th of January, 1927," the following: "interest thereon from the 10th day of December, 1927"; and as so modified, the judgment is affirmed.

Preston, J., Curtis, J., Waste, C. J., Shenk, J., Richards, J., and Seawell, J., concurred.