## ALAMEDA COUNTY v. UNITED STATES.
### No. 9748.

Circuit Court of Appeals, Ninth Circuit.

Dec. 20, 1941.

---

612

Ralph E. Hoyt, Dist. Atty., and J. F. Coakley, Robert H. McCreary, and Cecil Mosbacher, Deputies, all of Oakland, Cal., for appellant.

Francis M. Shea, Asst. Atty. Gen., Sidney J. Kaplan, Sp. Asst. to Atty. Gen., Brice Toole, Atty., Dept. of Justice, of Washington, D.C., and Frank J. Hennessy, U. S. Atty., and William E. Licking, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

Decree was entered for the United States in a suit brought by it against appellant for specific performance of a contract and for an adjudication of the rights thereunder.

The east shore line of San Francisco Bay, opposite the city of Oakland, runs about due south, and then southeast of San Leandro Bay (which is an arm of San Francisco Bay), then northeast and around San Leandro Bay, making a peninsula to the south and west of San Leandro Bay. About parallel with the southeast shore line mentioned above and north thereof is a channel extending southeasterly for about seven miles, which ended there prior to the construction of the Tidal Canal hereafter mentioned, thus making a peninsula, bounded by the channel on the north, San Francisco Bay on the west and south, and San Leandro Bay on the southeast.

By the Act of March 3, 1873, c. 233, § 2, 17 Stat. 565, the Secretary of War was directed to cause an examination or survey at San Antonio Creek, San Francisco Bay. The creek mentioned was apparently near the project in question. Report of the Chief of Engineers was made on February 16, 1874, proposing among other things, a canal to join the channel above mentioned with San Leandro Bay, for the purpose of permitting a scouring action in the channel by the ebb tide from San Leandro Bay. An appropriation of $100,-000 for the improvement of Oakland Harbor was made on June 23, 1874,[1] and another appropriation of a like sum on March 3, 1875.[2]

On March 4, 1876, appellee commenced proceedings in a state court of California to condemn certain lands and railroad rights of way. On November 4, 1882, decree was entered in the state court condemning certain lands and rights of way. The decree stated that the defendant railroad company had claimed no damages, and contained the following provision: "It is further ordered, adjudged and decreed that in the construction of said canal the plaintiff at its own expense construct and keep in repair suitable bridges across the same on all roads now used as public highways, crossing the line of said canal and also suitable railroad bridges on the present railroad tracks crossing the line of said canal." Railroad tracks were lo-cated at two places over the line of the canal, and on March 7, 1901, the United States paid the successor of the railroad $50,000 to be relieved of its duty to build a bridge at one of the points.

The United States began construction of the canal and the bridges and completed construction of the Park Street Bridge, which is closest to the channel above mentioned in 1891. It completed construction of the High Street Bridge, which is farthest from the channel, and the Fruitvale Avenue Bridge, which is about midway between the other two, in 1901. The bridges were drawbridges of the swing type, turning or pivoting horizontally upon central piers. They were equipped with hand-operated machinery, and approximately thirty minutes were required to open them, and about the same time was required to close them. The Fruitvale Avenue Bridge is a combination railroad, vehicular and pedestrian bridge, the railroad tracks and right of way thereon being permanent, integral and inseparable parts of such bridge. The tidal canal was constructed to a depth of from eight to ten feet below the plane of mean lower low water, and was completed in 1903.

On December 6, 1909, appellant's Board of Supervisors adopted a resolution providing that appellant "* * * hereby agrees to accept said bridges * * * and to assume all costs of future repair, operation and replacement of said bridges, provided that they and each of them be placed in such condition and repair by the United States of America, prior to such acceptance by the said County of Alameda, in the State of California, that said bridges, and each of them may be operated by electricity, and provided further that the United States shall, under such terms and conditions as it may see fit, lease the waterfront of the tidal canal and establish harbor lines so as to permit the construction of wharves and docks * * *" It was recited in the resolution that the portion of the tidal canal between the bridges "has never been open to navigation". At that time, the United States had occasionally opened and closed the bridges at the request of private interests for the passage of vessels, private interests occasionally opened and closed the bridges on their own responsibility for the passage of vessels, and boats,

---

[1] Act of June 23, 1874, c. 457, § 1, 18 Stat. 242.

[2] Act of March 3, 1875, c. 134, § 1, 18 Stat. 461.

barges and scows which could clear said bridges when closed plied up and down the canal.

In Senate Report No. 527, Sixty-First Cong., 2nd Sess., p. 615, dated April 11, 1910, on the Rivers and Harbors Act of June 25, 1910, it is said: "In connection with this improvement a Tidal Canal connecting San Leandro Bay with Oakland Channel was excavated by the United States. This canal was intended for flushing purposes only, and no provision was made for operation of bridges over it which are owned by the United States and are provided with draws. A demand appears to have arisen for the opening of the canal to navigation, as explained in the district officer's report, but the bridges form an impediment to such use, and he recommends that they be turned over to local authorities, who have signified their willingness to accept and operate them."

The act last mentioned[3] made an appropriation for the Oakland Harbor, and provided: "* * * That the three bridges heretofore built by the United States in connection with this improvement may be turned over to the local authorities to be maintained and operated by them upon such terms as to transfer and control as in the discretion of the Secretary of War may be equitable and just to the United States and to said local authorities: Provided further, That of the appropriation herein made so much as shall be necessary may be expended for such alterations and repairs to said bridges as in the discretion of the Secretary of War may be essential to meet the terms of said transfer."

Pursuant to that act the Secretary of War on September 3, 1910, granted to appellant a license, "revocable at will by the Secretary of War, to assume control of the said three (3) bridges" subject to five conditions, summarized as follows: (1) That the bridges should be open to all public traffic without charge and no exclusive privilege or right-of-way should be granted to any street car or other traffic corporation; (2) that for the purpose of securing compliance with the terms of the permit, the bridges should be under the supervision of an army engineer officer; (3) that the United States should put the bridges in condition for operation of their draws by electrical power, furnishing and installing new electrical machinery together with the necessary cables and wiring, furnishing bridge-tenders' houses and highway gates, and also overhauling all old machinery; (4) that appellant's Board of Supervisors should "maintain these bridges, attending to all necessary repairs, and rebuilding same if at any time burned, destroyed, or become inadequate for the purpose they serve"; and (5) that appellant's Board of Supervisors should maintain the necessary number of bridge-tenders at each bridge to insure prompt opening and closing of the draws.

On June 6, 1913, the United States established harbor lines, and made available to adjacent property owners, a twenty-five foot strip of property along each side of the canal for the construction of wharves and warehouses. The total cost to the United States for the repair and installation of electrical equipment for the bridges was $21,358.80.

On November 10, 1913, appellant's Board of Supervisors adopted a resolution, reciting that it had previously adopted the resolution to assume all costs of future repair, operation and replacement of the bridges on the conditions therein mentioned, that the license above mentioned had been issued, and that the United States had performed all things required by it to be performed, under the license. The resolution provided that appellant's Board of Supervisors "does hereby accept and assume control of the said three bridges * * * subject to the conditions and provisions of the aforesaid license of September 3, 1910, said acceptance being effective from and after Monday, November 17th, 1913".

On November 28, 1933, the United States and appellant reached an agreement whereby the Park Street Bridge was rebuilt, the United States furnishing approximately 30% of the cost thereof. Similar agreement was reached on August 2, 1938, regarding the rebuilding of the High Street Bridge, the United States furnishing approximately 45% of the cost thereof. Approximately $1,250,000 will be required to build the Fruitvale Avenue Bridge.

Appellant's total cost of operating and maintaining the Park Street Bridge from 1913 to the time when it was rebuilt was $200,245.57. Its total cost of operating the High Street Bridge from 1913 to the time when it was rebuilt was $240,672.69. Its total cost of operating and maintaining the

---

[3] Act of June 25, 1910, c. 382, § 1, 36 Stat. 661.

Fruitvale Avenue Bridge from 1913 to 1939 was $262,148.19. The sum of the three amounts is $703,066.45. The total cost of maintaining, operating or replacing the bridges since November 17, 1913, has exceeded the income and revenues provided for the fiscal year 1913–14, or any fiscal year prior thereto, and the expenditure was not assented to by two-thirds of the qualified electors of the County of Alameda voting at an election held for that purpose. However, the income and revenue provided by the County of Alameda for any fiscal year beginning in 1913 was sufficient to pay for the maintenance and operation of each bridge for such fiscal year.

Alameda County v. Ross, 32 Cal.App.2d 135, 89 P.2d 460, was decided on April 12, 1939. In that case, appellant's Board of Supervisors authorized the purchase of certain materials to be used for the repair of the railroad portion of the bridge, and approved and allowed the claim presented for such materials. Upon presentation of the claim to the county auditor for payment, the auditor refused payment. Appellant then filed in a state court a petition for a writ of mandamus to compel the auditor to issue a warrant in payment of the claim. The writ was denied, the court holding that the license issued by the Secretary of War was void because (1) being revocable at will by the Secretary of War, it lacked mutuality of obligations and consideration; and (2) the particular indebtedness involved in the proceeding constituted a gift of public funds to a private corporation in conflict with Article IV, § 31 of the state Constitution. The court further held that the installation of electrical equipment by the government did not make the agreement binding because it still lacked mutuality. Hearing in the Supreme Court of California was denied on June 1, 1939.

On July 27, 1939, the railroad wrote a proper official of the United States stating that appellant had informed it that appellant would no longer operate the Fruitvale Avenue Bridge, and demanded that the United States cause such bridge to be inspected and maintained.

On September 28, 1939, appellant notified a proper official of the United States that because of the decision in Alameda County v. Ross, supra, it would cease to operate the Fruitvale Avenue Bridge at midnight, December 31, 1939.

On January 17, 1940, the United States filed its complaint praying that specific performance of the agreement between the United States and appellant be ordered, that the court adjudge such agreement to be in full force and effect, and that thereunder appellant is obligated to repair, maintain, operate and replace the Fruitvale Avenue Bridge. The action was brought against the appellant, the railroad and the latter's lessee. The last two named parties filed an answer praying that the court adjudicate the United States alone or jointly with appellant to be obligated to maintain, keep in repair, renew, and operate the Fruitvale Avenue Bridge. Appellant answered praying that the rights of all parties be defined, declared and adjudicated, that the court decree that the United States is obligated to operate, maintain, repair, and replace the Fruitvale Avenue Bridge.

The report of the Chief of Engineers made on February 16, 1874, was made by a board of three engineers constituted by a special order. One member of such Board was one Mendell, who testified on the hearing of a motion for new trial made by one of the defendants in the condemnation suit above mentioned. He testified that he proposed the canal "for navigable purposes". Appellant sought to introduce the record testimony in the instant case, but the court below excluded it.

The findings of the court below were substantially as set forth above. In addition it found that the canal "was not open to navigation" prior to the time of installation of the electrical equipment for the bridges. Such finding is the only one challenged by appellant. Nine of the trial court's conclusions of law are challenged.

The court below entered a decree adjudicating that appellant was obligated to operate, maintain, repair and rebuild the Fruitvale Avenue Bridge and the United States is relieved of all liability to do so; that appellant is estopped to deny or question the validity of the contract between it and the United States; and that the United States, the railroad and its lessee are required to pay nothing toward the maintenance, repair, operation or rebuilding of the Fruitvale Avenue Bridge. In addition, the court ordered specific performance of the agreement. This appeal followed.

The first point requiring discussion relates to the effect on this case of Alameda County v. Ross, supra. Appellant contends

it is binding 'here, and appellee contends it has no such effect.

■ Insofar as is applicable and pertinent here, Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 114 A.L.R. 1487, declared: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law * * *." That rule was held to be applicable to suits in equity. Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 205, 58 S.Ct. 860, 82 L. Ed. 1290. The state law need not be declared by the highest court in the state, but must be accepted in the federal courts when declared by the intermediate courts of the state unless there is "convincing evidence that the law of the State is otherwise". Six Companies v. Joint Highway Dist., 311 U.S. 180, 188, 61 S.Ct. 186, 188, 85 L.Ed. 114. See also: Fidelity Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85, L.Ed. 109; West v. American T. & T. Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L.R. 956; Stoner v. New York Life Ins. Co., 311 U.S. 464, 61 S.Ct. 336, 85 L. Ed. 284. The state law to be applied is that existing now, even though it may differ from that which existed when the case was tried below. Vandenbark v. Owens-Illinois Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327.

Under the rule in Erie R. Co. v. Tompkins, supra, state law is applicable to all cases except "in matters governed by the Federal Constitution or by acts of Congress". The exception has been enlarged to include also treaties. Board of Com'rs v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313.

■ Appellee contends that the origin of its rights in the premises derives first from its Constitutional power over navigable waters, and, secondly, through enactment of the Act of 1910, and therefore state law is not binding here. We think it is clear that no constitutional provision is involved. No one questions appellee's power over navigable waters. The alleged rights sought to be enforced here, are not rights to control navigable waters, but alleged rights to compel operation, maintenance and replacement of a bridge by appellant. Such alleged rights stem not from a constitutional provision, because nothing in the constitution purports to affirm that appellant must operate any bridge, but arise from a contract alleged to have been entered into between appellant and appellee. Any obligation of appellant to operate, maintain and replace the bridge in question is found in the alleged contract, and not in a constitutional provision.

Regarding cases governed by federal statutes, shortly after the decision of Erie R. Co. v. Tompkins, supra, it was held that state law was not applicable in a tax case governed by a federal statute. Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410. No reference was therein made to Erie R. Co. v. Tompkins, supra. However, in subsequent cases, it is made clear that in those controversies where a federal statute controls, state law is not applicable, in conformity with the statement of the rule in Erie R. Co. v. Tompkins, supra, Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694; Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754; Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361. Do not these cases demonstrate also that the statement in Erie R. Co. v. Tompkins, supra, that there "is no federal general common law" is in words too broad, because it is apparent that in such cases such law is applied?

Regarding the statute in question, there is nothing in it which confers on appellee any right against appellant. It simply decrees that the three bridges "may be turned over to the local authorities to be maintained and operated by them upon such terms as to transfer and control as in the discretion of the Secretary of War may be equitable and just to the United States and to said local authorities". It does not purport to impose any obligation on appellant, or to specify the terms of "transfer and control". While the power of the Secretary of War to enter into a contract at all is specified in the statute, the terms to be included in any contract to be thereafter entered into are not specified, and there is nothing in such statute which purports to confer on appellant any power whatever, even if it could do so. Likewise, there is nothing in the statute which purports to validate a contract in advance.

■■ The state court decision held that the agreement, the terms of which were specified in the license, was void because it

lacked mutuality, and because appellant had no power to enter into such an agreement involving a gift to a private corporation. Neither of these matters is mentioned in the Act of 1910, and we think the state court decision on that point binds us here. The indication, even prior to Erie R. Co. v. Tompkins, supra, was that the federal courts would regard as authoritative the state decisions as to the "extent and character of the powers which its various political and municipal organizations shall possess". Claiborne County v. Brooks, 110 U.S. 400, 410, 4 S.Ct. 489, 494, 28 L.Ed. 470. See also: American Surety Co. v. Bellingham Nat. Bank, 9 Cir., 254 F. 54.

Appellee further contends that "the California court was led into error by the omission of the Resolution of 1909 from the stipulation of fact upon which it based its decision". It may be doubted that we may disregard Alameda County v. Ross, supra, simply because we disagree with it. Fidelity Trust Co. v. Field, supra, 311 U.S. page 179, 61 S.Ct. 176, 85 L.Ed. 109. It may also be doubted that there was any such omission, because the Resolution of 1913, which was before the state court, stated the substance of the Resolution of 1909. However, whether the Resolution of 1909 was or was not before the state court, is immaterial because of the grounds of its decision, and because the obligation of appellant as involved here, was no different under the Resolution of 1909 than it was under the license.

■ There is an intimation in appellee's brief that Alameda County v. Ross, supra, was at least a "friendly" if not collusive proceeding, and therefore should not be regarded as binding here. Nothing in the record discloses any basis for speculating to that effect. In fact, there is nothing in the record regarding the subject at all. We suppose that in the absence of any such showing, the public officials of the state are entitled to the presumption that they acted fairly and honestly in the performance of their duties. Certainly we should be slow in imputing fraud on their part.

The state court's decision regarding validity of the contract is shown by the following quotation from the opinion (32 Cal. App.2d page 145, 89 P.2d page 464): "Mutuality of obligations is an essential element in every binding contract. In the present case there is an absolute absence of mutuality for the reason that the government may cancel the agreement and deprive the County of Alameda of the use or control of the bridges at any moment without cause." Thus it is clear that the ground of decision would not have been different, no matter what the appellant's original offer might have contained. The basis of the holding was the provision specified in the license, i. e., that the license was revocable at any time without cause.

The other ground of decision appears from the following quotation (32 Cal.App. 2d page 142, 89 P.2d page 463): "* * * The language of the license clearly requires the county to pay for the maintenance and improvements for the sole benefit of a private railroad corporation, and to maintain, repair and reconstruct the bridges with full knowledge that upon completion thereof the contract is subject to immediate revocation. The board of supervisors had no power to bind the county to such an illegal contract. It is absolutely void for lack of mutuality and consideration. It also constitutes an illegal contribution of public funds for the benefit of a private corporation." See also page 147 of 32 Cal.App.2d, 89 P.2d 460.

■ The Resolution of 1909, of course, adds nothing to the power of appellant's board of supervisors. The power of such board is derived not from its resolutions but from the state constitution and statutes.

We believe, therefore, that Alameda County v. Ross, supra, is binding here, and its application requires the decision that the agreement between appellant·and appellee, whether evidenced by the Resolution of 1909, the license, and the Resolution of 1913 or the latter two documents alone, is void for lack of mutuality, and because the "board of supervisors had no power to bind the county to such an illegal contract". 32 Cal.App.2d page 142, 89 P.2d page 463.

■ Only one other contention need be noticed. Appellee contends that appellant is estopped from asserting invalidity of the contract. The contention is based on an erroneous assumption that appellant had power to enter into the contract, as appears from the following statement in appellee's brief: "* * * It is true that a county may not be estopped unless it was acting within the scope of its authority, but it has been shown above that the construction, operation, and maintenance of bridges is expressly within the power of a county so

that this question is not involved here." It is thus conceded that estoppel cannot be urged if the contract was one without the powers of appellant. Since Alameda County v. Ross, supra, held that appellant exceeded its powers, the county cannot be estopped from asserting that fact. Los Angeles Dredging Co. v. Long Beach, 210 Cal. 348, 353, 291 P. 839, 71 A.L.R. 161.

Appellant's answer prayed for a decree declaring that appellee was obligated to maintain, repair and replace the bridges, and for an injunction compelling appellee to perform its obligations. The prayer is apparently based on the theory that the obligation of the United States was fixed by the state court decree in the condemnation proceedings. Appellant was a party to those proceedings. No contention is made that the state court lacks power to enforce its own decree and we perceive none. Whether or not, under the rule of comity, we are prohibited from enforcing the state court decree (see Toucey v. New York Life Ins. Co., November 17, 1941, 62 S.Ct. 139, 86 L.Ed. —), we need not now determine. It is sufficient to say that no reason why the state court cannot enforce its own decree is shown here, and under these circumstances, we think the state court should be given an opportunity to do so, if that becomes necessary.

The decree is reversed and the cause is remanded to the trial court, with directions to enter a decree adjudicating the contract between appellant and appellee to be null and void.