## DEPARTMENT OF WATER & POWER OF CITY OF LOS ANGELES et al. v. OKO-NITE–CALLENDER CABLE CO., Inc.

### No. 12337.

United States Court of Appeals
Ninth Circuit.

April 5, 1950.

Ray L. Chesebro, City Attorney, Gilmore Tillman, Chief Asst. City Attorney for Water and Power, Russell B. Jarvis, Asst. City Attorney, Gerald Luhman, Deputy City Attorney, Los Angeles, Cal., for appellant.

Stephen A. Wilson, Passaic, N. J., Henry F. Prince, Frederic H. Sturdy, Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellee.

Before HEALY, ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellee, a New Jersey corporation, here called Okonite, sued the appellant City of Los Angeles, and its Department of Water and Power, to recover a balance alleged to be due upon its contract for the manufacture and sale of six items of lead covered power cable with respect to which Okonite had been the successful bidder. Okonite had judgment for $9,996.69, substantially the amount prayed for.

The City asserts, as it claimed below, that it had paid the entire contract price. The dispute between the parties, which was as to the amount of the contract price, arose because of their differing interpretations of an "escalator" clause in the specifications upon which the bids were made, whereby the base price specified in the bids for the different items was to be adjusted for changes in material costs during the period in which the contract was to be performed.[1]

The material portions of the price adjustment clause are quoted in the margin.[2] The present dispute is as to the meaning of the following sentence in the clause: "b. The above amount accepted as representing material will be adjusted for increases in material costs, such adjustment to be based on the index of wholesale prices for 'Group VI—Metals and Metal Products' compiled monthly by the U. S. Department of Labor."

The monthly compilations of the Department of Labor gave two sets of figures. Thus the mimeographed release for the month of January, 1947, one of the months here involved, first lists under the heading, "Average Wholesale Prices and Index Numbers Individual Commodities" some 800 commodities, each indicated by a number, which identifies it, and opposite the number is given the average price of that commodity for the month, and its "index number". This index number expresses the relation of the average price given to the price for the year 1926, the latter being taken as 100. In this first list the commodities are arranged in 10 main groups, the first of which is "Farm Products", and the last "Miscellaneous". The sixth group is headed "Metals and metal products". Under the heading are six subheads or sub-groups, headed: "Agricultural implements", "Farm machinery", "Iron and steel", "Motor vehicles", "Nonferrous metals", and "Plumbing and heating". The two metals which were incorporated in the cable called for by the contract appear under the heading "nonferrous metals", and are identified as number 472.1 "Copper, electrolytic, delivered Connecticut Valley", and number 473 "Lead, pig, desilverized, f. o. b. New York". In this month, January, 1947, their index numbers are shown as 139.6 and 154.2, respectively.

The same release also lists under the

1. Provision was also made for adjustment for changes in labor costs, but no controversy arose out of such changes.

2. "1.3. Price Adjustment Clause: The contract price shall be subject to adjustment for changes in labor and/or material costs, such adjustments to be determined in accordance with the following method, provided, however, that the price shall not be increased by virtue of this adjustment to an amount in excess of the applicable maximum price established at the date of delivery by the OPA pursuant to the Emergency Price Control Act of 1942.

* * * * * * *

"2. Material:
"a. For the purpose of adjustment, the proportion of the contract price representing material is accepted as 50%.
"b. The above amount accepted as

representing material will be adjusted for increases in material costs, such adjustment to be based on the index of wholesale prices for 'Group VI—Metals and Metal Products' compiled monthly by the U. S. Department of Labor. The average of the monthly material index figures for the period from the Base Month to and including the month specified in the contract for final shipment will be computed and the percentage increase, if any, will be secured by a comparison of such average monthly material index figure with the material index figure for the Base Month. The adjustment for increases in material will be obtained by applying such percentage of increase, if any, to the amount of the contract price representing material, as indicated above, and the result will be accepted as an increase in the contract price."

heading, "Appendix Index Numbers of Wholesale Prices by Groups and Subgroups of Commodities", the same ten groups, with the various subgroups under each, and opposite each group is the index number for the group, for the month of January, 1947, and for two preceding months, and for sundry months in previous years. Here, again, "Metals and metal products" is the sixth group listed, and its index number for January, 1947, (as compared to 100 for 1926), is 138.

The controversy relates to price variations from the base month, April, 1946, to March, 1947. The Labor Department figures for the months in 1947 are shown in monthly releases similar to the one just described. The figures for the months in 1946 are compiled in a Department Bulletin No. 920, entitled "Wholesale Prices, 1946". It contains the same two tabulations of index numbers; Table 1 being "Index numbers of primary market prices, by *groups* and *subgroups* of commodities," and Table 12, "Primary market prices, index numbers, and relative importance of *individual commodities* 1946". (Emphasis supplied) Both tables are arranged by months and the groups and commodities are listed in the same order as in the January, 1947 release described above.

The parties disagree as to which of these index numbers are to be referred to in computing the price adjustment. Okonite contended, and the court held, that the price adjustment should be dependent upon the index numbers of the copper and lead, the component metallic materials of the cable. The city's contention is that the index number referred to is that of the "metals and metal products" group.

The method of applying the appropriate index numbers is stated in the specifications as follows: "The average of the monthly material index figures for the period from the Base Month to and including the month specified in the contract for final shipment will be computed and the percentage increase, if any, will be secured by a comparison of such average monthly material index figure with the material index figure for the Base Month. The adjustment for increases in material will be obtained by applying such percentage of increase, if any, to the amount of the contract price representing material, as indicated above, and the result will be accepted as an increase in the contract price."

In the base month of April, 1946, the date of the bid, the index figures for copper and lead were lower than that for the whole group, while in the later months, as in the month of January, mentioned above, the index figures for the two metals were on the whole higher than those for the group "Metals and metal products" for the same months.

Upon the City's construction of the escalator clause and basing the adjustment upon the group indexes alone, calculation in the manner stated in the specification last quoted disclosed price increases on the dates of delivery called for, in October, 1946, and in January and March, 1947, of 4.8, 10.4 and 13.2 per cent, respectively. Okonite's calculation, however, starting with lower index figures on the base date, and proceeding to average index figures for later months which were higher than those for the group, necessarily produced higher percentages of increase, which, for the same delivery dates were 17.6, 33.2 and 43.2 per cent.

In adopting Okonite's version of the contract language, the court concluded: "That said price adjustment clause properly construed was intended to refer to and requires a reference to and use of the individual commodity index numbers of copper, Commodity No. 472.1, and lead, Commodity No. 473, in said 'Average Wholesale Prices and Index Numbers of Individual Commodities' as published monthly in mimeographic form by the United States Bureau of Labor Statistics at Washington, D. C., from and including April, 1946 to and including March, 1947. That said price adjustment clause does not refer to and was not intended to refer to any index numbers of Metals and Metal Products as a group or subgroup in said publications."

The court took this view, it stated in its findings, because "The Court finds that the construction of the price adjustment clause of said contract contended for by

defendants would render said price adjustment clause unfair, unreasonable, inaccurate and speculative; while on the other hand the construction of said price adjustment clause contended for by plaintiff, and herein found by the Court to be the correct construction, renders said clause reasonable, fair and definite and is the only construction which the parties as reasonable business men could have had in contemplation at the time when said contract was entered into." In the opinion of the trial judge, "Any other construction, such as the construction which would make the price dependent upon the average of some 140 metals which are listed by the Department of Labor would be unrealistic."

Upon this appeal the City says that the language of the adjustment clause is susceptible of but one meaning, that as written it referred to the index numbers given in the Labor Department publications for the "Metals and metal products" group. The argument is that the words "based on the index of wholesale prices for 'Group VI—Metals and Metal Products' compiled monthly by the U. S. Department of Labor" can mean nothing else. It is said that although the publications list no group under either a Roman numeral VI, or any other number, for that matter, yet in all the lists, whether of groups or of commodities, "metals and metal products" constitute the sixth group of commodities, and therefore there can be no uncertainty or ambiguity in the designation of the figures to be used.

On its part Okonite points to the testimony as to the circumstances surrounding the adoption of the "escalator" device in the City's specifications. There was testimony that when the bids were called for copper and lead were controlled by the government and manufacturers were permitted to purchase no more than their production requirements for the next ensuing month. In consequence it was found impossible for the City to purchase material on a firm price basis. The clause was adopted by the City, and used in its contracts for purchase of many materials coming within this group, as a clause useful in all such cases to encourage bidding and also to permit the City to obtain the advantage of any price decreases. Emphasis is placed upon the testimony given by the city's purchasing agent on cross-examination as follows:

"Q. How did you come to put in the escalator clause? A. There were two reasons. The first one was, to be able to do business, and, second, the adjustment clause was a protection to the parties.

"Q. You were trying to work out a fair clause for the protection of both parties? A. Yes. The main thing, if prices went down we wanted it.

"The Court: You were buying a great variety of products? A. Yes.

"The Court: All sorts of electrical supplies? A. Yes.

"The Court: You were not interested so much in the general uptrend of prices as in the trend in things you wanted? A. That is correct.

"The Court: If the price of groceries had gone up 100 per cent, you didn't care; you were interested in the price of electrical products? A. The adjustment clause was to favor those particular commodities."

Okonite argues that if, as might properly be assumed, the object of the price adjustment clause was to give assurance to prospective bidders against losses due to changes in material costs, that object could be obtained only by assuring charges based on the index figure changes in the particular materials which the bidder must acquire. It calls attention to the fact that the group "metals and metal products" contains 141 separate commodities, 111 of which are strictly manufactured articles such as farm machinery, farm equipment, automobiles and trucks, plumbing material and fixtures. It is argued that to a manufacturer in the position of Okonite, an escalator arrangement based on the group index would furnish no certain assurance of protection, for his required materials might increase while the group as a whole might decline. To illustrate this possibility Okonite points out that the publications here in evidence disclose that during the period here involved, while the group in-

dex advanced from 108.8 to 139.9, the index of quicksilver, another nonferrous metal, dropped from 104.50 to 87.25. How, says Okonite, could the bidder interested in copper and lead, be assured that during the contract period, a discrepancy just the reverse of that shown in respect to quicksilver would not occur.

Okonite also says that when the price adjustment clause is read in its entirety its text discloses that the adjustment was intended to be made according to changes in the costs of the individual materials. It points to the use of the words "changes in labor and/or material costs" in the first paragraph numbered 1.3, following the heading "Price Adjustment Clause", (see Note 2 supra). It suggests the significance of the words "increases in material costs", "material index figures" and "increases in material" in subparagraph b. This, it is said, is not apt language if the group index alone was intended.

On the other hand the City introduced in evidence six invoices furnished it by Okonite during the progress of the performance of the contract, dated from December 23, 1946 to April 16, 1947, in which the material price increases were calculated on the group indexes, using the method which the City asserts the contract specified. The bills thus submitted were promptly paid. The City argues with much force, that these invoices are evidence of a practical construction of the agreement as having the meaning claimed by the City. After all shipments had been completed and in October, 1947, a final invoice was submitted recalculating the increases demanded in accord with Okonite's present claim. This was prepared by Okonite's chief executive officer, who explained the earlier invoices as having been prepared by subordinate employees without his knowledge.

We think that the trial court was justified in arriving at the conclusion it did. It is our view that it cannot be said that the contract clearly required adjustment solely with reference to the group index figures. We think a reading of the contract would at least disclose an ambiguity. Surely a party to such a contract might reasonably understand it to mean what the court has held it did mean.

■ From such ambiguity two results follow: (1) the court properly received evidence designed to resolve the ambiguity, Balfour v. Fresno Canal & Irrigation Co., 109 Cal. 221, 41 P. 876, and (2) the meaning intended became a question of fact, Walsh v. Walsh, 18 Cal.2d 439, 116 P.2d 62, the court's determination of which is entitled to the respect which we are required to give a district court's findings. Federal Rules of Civil Procedure, rule 52 (a), 28 U.S.C.A. The record contains evidence which tends to support both views, but the weight of such evidence, as of the evidence of the invoices furnished, was for determination by the judge who tried the case.

■■ We think the court has given the clause a reasonable interpretation. California Civil Code, Sec. 1643. It should also be noted that the language here in dispute was that inserted in the specifications prepared by the City and submitted to the bidders. Therefore the rule of construction stated in Pacific Lumber Co. v. Industrial Acc. Comm., 22 Cal.2d 410, 422, 139 P.2d 892, 898, is particularly applicable: "The written contract under which Turkovich was operating at the time of his injury was prepared entirely by the company, and, therefore, according to the well established rule of construction, is to be construed in favor of Turkovich and against the company." [3]

3. Cal.Civ.Code, sec. 1654: "Words to be taken most strongly against whom. In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promissor is presumed to be such party; except in a contract between a public officer or body, as such, and a private party, in which it is presumed that all uncertainty was caused by the private party."

Since the record here discloses that the language in controversy was prepared by the City and made a part of its specifications we take it that the presumption mentioned in the statute has been rebutted by the showing that the City prepared the specifications.

Appellant asserts that even assuming the propriety of calculating the increases on the basis of the index figures for copper and lead, the court incorrectly computed the increase in that it took the average of the two indexes from month to month, and failed to take into account that the cable did not contain copper and lead in equal amounts, either by volume, or by weight, or by cost, but that the copper and lead constituents varied in the six types of cable furnished by Okonite. The City introduced exhibits to show these proportions.

■ But even if we were to assume that the court should have taken such variations into consideration, and determined a sort of weighted average, we think that the record fails to show that the City has been prejudiced by the method the court used. The City's evidence showed that of the six types of cable involved, five, representing a base price under the contract of $88,812, carried substantially more lead than copper, in volumes, weights and costs. One type, representing a base price of $2,284, carried more copper than lead. The Labor Department publications disclose that the index figures for lead, during this period, increased more rapidly than those for copper, (from 77.1 to 177.9 as against from 85.4 to 151.2). It is thus apparent that the use of the method of calculation for which the City now argues would but have increased the amount owing.

The City contends that the district court was in error in including in its judgment an award of interest for the period from May 1, 1947, to the date of the judgment. It asserts that under the law of California interest may not be recovered against a municipality prior to judgment in the absence of a contract for the payment of interest or express statutory provision for the award of interest. In the case of Engebretson v. City of San Diego, 185 Cal. 475, 197 P. 651, it was held that "in order to recover interest against a munici-

pality, there must be some statutory provision authorizing it." Cal.Civ.Code, section 3287, which was in effect at the time this case was decided, provides generally that every person entitled to recover damages certain, or capable of being made certain by calculation, is entitled to recover interest. However, the California court in that case held that similar code sections providing generally for interest do not apply to the State or any of its subdivisions. The rule of the Engebretson case was followed in Los Angeles Dredging Co. v. City of Long Beach, 210 Cal. 348, 291 P. 839, 71 A.L.R. 161.

Okonite says that these cases are not in point here for the reason that the City of Los Angeles operates its Department of Water and Power in its proprietary capacity; that the cases which hold that interest may not be recovered for any period prior to judgment are cases in which the obligation out of which the judgment arose was incurred by the municipality while acting in its governmental capacity. It contends that the rule of the state's immunity from claims for interest, which has been extended to cities in these cases should have no application to a claim arising out of the operation of a city electric plant.

An examination of the Engebretson case, supra, discloses that the court's conclusion was based upon several lines of reasoning. It is said that for reasons of public policy, general statutes authorizing recovery of interest should not be held to be applicable to the State, and that a municipality should share in this favor.[4] Attention was called to the method of auditing and paying accounts in the city; that this was a process which necessitates delay, and that a claimant against the city should not be permitted to claim interest and thus convert his claim into an interest-bearing investment, either because of the time required to process his claim or through his own delay in applying for his warrant.[5]

While Okonite argues that the California

4. It is interesting to note that when that case was decided, recovery of interest against the state was authorized by statute, Stats.1873, Ch. 45, and this is still true, Government Code, Sec. 16051.

5. The complaint alleged "that prior to the commencement of this action plaintiff duly and regularly filed and presented to the defendants a duly verified claim as required by law claiming that said de-

decisions denying recovery of interest against municipalities should be distinguished on the ground that here the City was acting in its proprietary capacity, Douglass v. City of Los Angeles, 5 Cal.2d 123, 53 P.2d 353; Peccolo v. City of Los Angeles, 8 Cal.2d 532, 66 P.2d 651, yet a careful examination of the California cases will disclose that California courts have never drawn any such distinction.[6] We note also that counsel for Okonite have been unable to find any case either in California or elsewhere drawing this distinction with respect to recovery of interest. The distinction which the courts generally draw between the governmental and proprietary capacity of a city has had its origin in cases involving tort claims against cities. Apparently the rule which permits recovery through this distinction was evolved to avoid hardship which would result from a general extension of the doctrine of governmental immunity to all city activities. The California courts have declined to draw this distinction in applying other legal rules and have intimated that its application is limited to the tort cases mentioned. Irish v. Hahn, 208 Cal. 339, 344, 281 P. 385, 66 A.L.R. 1382; City of Los Angeles v. Los Angeles etc. Council, 94 Cal.App.2d 36, 210 P.2d 305, 311.

We are unable to find, either in California decisions, or in decisions elsewhere, evidence that any such distinction as that urged upon us by Okonite has ever been recognized. While in some jurisdictions it is held that a municipality is liable for interest as fully as an individual or private corporation yet in a substantial number of jurisdictions the California rule prevails,

and it would appear that in no such jurisdiction has there been any mention of the possibility that liability for interest might be predicated upon the proprietary character of an activity out of which an obligation might arise.

In view of the long period of time during which the California decisions cited have stood without modification or qualification and during which time no legislative modification has occurred, we do not believe that the California courts would now undertake to qualify the generality of the language with which they have pronounced such interest not recoverable.

The City has assigned error in the admission of certain testimony given by Okonite's managing executive. Included is testimony that Okonite did not have sufficient copper and lead on hand to meet the contract requirements when the bids were made, and the testimony that the extra cost to Okonite due to increased prices of these materials was about $24,000. It is argued that such testimony was irrelevant and immaterial.

It is our opinion, however, that in view of the fact that this case was tried to a court without a jury it cannot be said that this evidence was prejudicial. That it was not and that the court was in no manner influenced by it is made clear from the findings and from the court's opinion which make no mention of these circumstances. 28 U.S.C.A. § 2111; Federal Rules Civil Procedure, rule 61.

We find no merit in the objections taken to the other testimony given. For the reasons previously expressed, we think the evi-

---

fendants", were indebted for the additional amounts sued for. This claim was not presented until October 15, 1947. So far as the record shows, it would appear that under any rule there was no justification for allowing interest, as the court did, from May 1, 1947, if we assume, as seems to be conceded in the complaint, that the amounts payable under the price adjustment clause would have to be demanded in a claim filed with the city for that purpose.

6. We think the case of Los Angeles Dredging Co. v. City of Long Beach, supra, significant here. There judgment was recovered against the City for sums payable under a contract for harbor dredging. The court must have been mindful that a city's harbor maintenance activities are frequently held to be in its proprietary capacity. Cf. Ravettino v. City of San Diego, 70 Cal.App.2d 37, 160 P.2d 52, 55. Yet the court applied the Engebretson rule without alluding to the character of the city's harbor maintenance activities.

dence as to the circumstances under which the contract was drawn was properly admitted.

For the reasons herein stated the judgment is affirmed save and except as to that portion which awards the appellee interest for the period prior to the date on which the judgment was entered. The case is remanded with directions to the court to modify the judgment by excluding therefrom the award of interest prior to the date of the judgment. As so modified the judgment shall stand affirmed as of its original date, March 14, 1949, from which date it shall bear interest.